No. 24-4304

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARILYN J. MOSBY,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Maryland, No. 1:22-cr-00007 (Griggsby, J.)

## OPENING BRIEF FOR MARILYN J. MOSBY

JAMES WYDA
MAGGIE GRACE
OFFICE OF THE FEDERAL
   PUBLIC DEFENDER
100 S. Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
(410) 962-3962

PARESH S. PATEL
CULLEN O. MACBETH
OFFICE OF THE FEDERAL
   PUBLIC DEFENDER
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
(301) 344-0600

DANIEL S. VOLCHOK
CARRIE M. MONTGOMERY
NITISHA BARONIA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

ALAN SCHOENFELD
CHARLES C. BRIDGE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
(212) 230-8800

August 19, 2024

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ............................................................................1

JURISDICTION .............................................................................4

ISSUES PRESENTED .......................................................................4

STATEMENT ................................................................................5

     A.     Factual Background .............................................................5

         1.     Ms. Mosby's Service As Baltimore City State's Attorney ..............................................................5

         2.     Amidst Marital Difficulties, Ms. Mosby Prepares For Life After Public Service .......................................6

         3.     Ms. Mosby's Withdrawals From Her Retirement Account ........................................................8

         4.     Ms. Mosby's Purchases Of Two Florida Homes ......................11

     B.     Procedural History ............................................................12

         1.     Indictment And Severance ............................................12

         2.     Perjury Trial ...........................................................13

         3.     Mortgage-Fraud Trial .................................................15

         4.     Forfeiture And Sentencing ............................................18

SUMMARY OF ARGUMENT ...............................................................19

STANDARDS OF REVIEW .................................................................21

ARGUMENT ...................................................................................22

I.   THE MORTGAGE-FRAUD CONVICTION SHOULD BE REVERSED.....................22

     A.   The Venue-Related Errors Each Require Reversal...........................22

          1.   The Venue Instruction Erroneously Permitted
               Jurors To Find Venue Based On Preparatory Acts
               Alone Occurring In Maryland....................................................23

          2.   The Evidence Was Legally Insufficient To Prove
               Venue In Maryland ..................................................................27

     B.   The District Court Erroneously Admitted Details Of The
          Perjury Convictions As Substantive Evidence...................................30

          1.   The District Court's Pre-Trial Ruling And Mid-
               Trial Reversal...........................................................................31

          2.   The District Court Abused Its Discretion By
               Reversing Its Pre-Trial Ruling.................................................32

          3.   The Error Was Not Harmless....................................................34

II.  THE PERJURY CONVICTIONS SHOULD BE REVERSED.....................................39

     A.   The Term "Adverse Financial Consequences" Is
          Fundamentally Ambiguous And Therefore Cannot
          Support Perjury Charges .....................................................................39

     B.   Evidence Of Ms. Mosby's Use Of The Withdrawn Funds
          Was Inadmissible ................................................................................42

          1.   The Use Evidence Was Irrelevant .............................................43

          2.   Any Probative Value Was Substantially
               Outweighed By The Risk Of Unfair Prejudice And
               Jury Confusion .........................................................................45

          3.   The Error Was Not Harmless....................................................47

III.  THE COURT SHOULD REVERSE THE FORFEITURE ORDER ...............................49

       A.    The Longboat Key Property Is Not Statutorily Subject To
             Forfeiture ...........................................................................................50

       B.    The Forfeiture Is An Unconstitutional Excessive Fine ......................53

CONCLUSION ...........................................................................................................59

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Old Chief v. United States*, 519 U.S. 172 (1997)......................................45

*One 1995 Toyota Pick-Up Truck v. District of Columbia*, 718 A.2d 558 (D.C. 1998) ................................................................59

*Pimentel v. City of Los Angeles*, 974 F.3d 917 (9th Cir. 2020) ..............................58

*Reass v. United States*, 99 F.2d 752 (4th Cir. 1938)....................................17, 24, 27

*Sizemore v. Fletcher*, 921 F.2d 667 (6th Cir. 1990) ................................................46

*Sparks v. Gilley Trucking Co.*, 992 F.2d 50 (4th Cir. 1993)....................................48

*Timbs v. Indiana*, 586 U.S. 146 (2019)........................................................58

*United States v. 3814 NW Thurman Street*, 164 F.3d 1191 (9th Cir. 1999) .................................................................54, 55

*United States v. Ahmad*, 213 F.3d 805 (4th Cir. 2000)....................................54, 57

*United States v. Bajakajian*, 524 U.S. 321 (1998)..........................22, 53, 54, 55, 57

*United States v. Barringer*, 25 F.4th 239 (4th Cir. 2022)....................................38

*United States v. Bennett*, 986 F.3d 389 (4th Cir. 2021)....................................54, 58

*United States v. Birchette*, 908 F.3d 50 (4th Cir. 2018) ........................................34

*United States v. Blackman*, 746 F.3d 137 (4th Cir. 2014) ........................................55

*United States v. Blackshire*, 538 F.2d 569 (4th Cir. 1976)....................................48

*United States v. Cabrales*, 524 U.S. 1 (1998)........................................................23

*United States v. Cherry*, 330 F.3d 658 (4th Cir. 2003)....................................49, 50

*United States v. Corona*, 34 F.3d 876 (9th Cir. 1994) ........................................25

*United States v. Dillard*, 891 F.3d 151 (4th Cir. 2018) ........................................47

*United States v. Dodge*, 963 F.3d 379 (4th Cir. 2020) ............................................24

*United States v. Farkas*, 474 F.App'x 349 (4th Cir. 2012) .....................................50

*United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024) ...............21, 35, 47, 48, 49

*United States v. Georgacarakos*, 988 F.2d 1289 (1st Cir. 1993) ...........................25

*United States v. Hall*, 858 F.3d 254 (4th Cir. 2017) .............................34, 36, 37, 38

*United States v. Ibisevic*, 675 F.3d 342 (4th Cir. 2012)..........................................48

*United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010)...........................55, 57

*United States v. Johnson*, 323 U.S. 273 (1944) .....................................................22

*United States v. Johnson*, 600 F.App'x 872 (4th Cir. 2015) ............................48, 49

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010).........................................21

*United States v. Johnson*, 996 F.3d 200 (4th Cir. 2021).........................................37

*United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986)..............................................39

*United States v. Mallory*, 337 F.Supp.3d 621 (E.D. Va. 2018) ..............................29

*United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991)....................................39

*United States v. McLaurin*, 764 F.3d 372 (4th Cir. 2014) ......................................33

*United States v. Miller*, 111 F.3d 747 (10th Cir. 1997) ..........................................22

*United States v. Moran-Garcia*, 966 F.3d 966 (9th Cir. 2020) ..............................22

*United States v. Nyman*, 649 F.2d 208 (4th Cir. 1980)...........................................48

*United States v. One Single Family Residence Located at 18755 North Bay Road*, 13 F.3d 1493 (11th Cir. 1994) ......................................................56

*United States v. Oregon*, 671 F.3d 484 (4th Cir. 2012)...........................................22

*United States v. Palomino-Coronado*, 805 F.3d 127 (4th Cir. 2015).....................21

*United States v. Perry*, 757 F.3d 166 (4th Cir. 2014)..............................................21

*United States v. Purcell*, 967 F.3d 159 (2d Cir. 2020) ......................................28, 29

*United States v. Robinson*, 8 F.3d 398 (7th Cir. 1993)...............................................34

*United States v. Ryan*, 828 F.2d 1010 (3d Cir. 1987)...............................................40

*United States v. Sanders*, 107 F.4th 223 (4th Cir. 2024) .........................................53

*United States v. Sanders*, 964 F.2d 295 (4th Cir. 1992) ..........................................35

*United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012) .......................13, 39, 40, 42

*United States v. Smithers*, 92 F.4th 237 (4th Cir. 2024)..............................21, 26, 27

*United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980)....................................................46

*United States v. Sterling*, 860 F.3d 233 (4th Cir. 2017) ..... 17, 24, 25, 26, 27, 28, 29

*United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) .............................................25

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011) ..............................................25

*United States v. Van Brocklin*, 115 F.3d 587 (8th Cir. 1997)..................................56

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014) ............................................46

*von Hofe v. United States*, 492 F.3d 175 (2d Cir. 2007)...........................................58

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const.
    amend. VI...................................................................................................23
    art. III, §2, cl. 3 .........................................................................................23

18 U.S.C.
    §982 ....................................................................................................12, 50
    §1014 ..........................................................................................................57
    §3231 ............................................................................................................4
    §3742 ............................................................................................................4

26 U.S.C. §457..............................................................................................8

28 U.S.C. §1291 ............................................................................................4

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No.
116-136, 134 Stat. 281 (2020) .............................................................8, 9, 10

**RULES**

Federal Rule of Appellate Procedure 4 .......................................................4

Federal Rule of Criminal Procedure
18 ..........................................................................................................23
32.2 ...................................................................................................4, 50

Federal Rule of Evidence
403 ...................................................................................................43, 47
404 .......................................................................................................15

**OTHER AUTHORITIES**

Goldman Sachs, *CARES Act: Penalty-free withdrawals* (Sept. 9,
2020), https://tinyurl.com/47z86kvm ...........................................40

IRS, *Retirement topics: Exceptions to tax on early distributions*
(updated Dec. 8, 2023), https://tinyurl.com/24h7fw75 ..................8

Merriam-Webster, *Finance*, https://tinyurl.com/4836mjxr (visited
Aug. 19, 2024) .............................................................................40

**INTRODUCTION**

During the COVID pandemic, Marilyn Mosby—then approaching the end of 14 years of public service as a Baltimore prosecutor, including eight high-profile years as the city's elected top prosecutor—was trying to figure out next steps in her life and career.  On the personal side, she was contemplating separation from her husband, with whom she had two young daughters, and seeking to establish financial independence from a 17-year marriage, all during the pandemic.

Ms. Mosby laid the groundwork for financial independence by starting a travel business focused on underserved populations, and purchasing two homes in Florida that she hoped would serve as important escapes for her and her daughters. To help finance the purchases, Ms. Mosby twice withdrew funds from the retirement account she established during her service for the city and people of Baltimore.

Based on these events, federal prosecutors in Baltimore chose to devote enormous resources to prosecuting Ms. Mosby (their state counterpart in law-enforcement).  They charged her with two counts each of perjury and mortgage fraud.  The theory of the perjury charges was that Ms. Mosby, in withdrawing her retirement funds, had checked a box certifying under penalty of perjury that she had suffered COVID-related "adverse financial consequences" when (according to prosecutors) she knew she had not.  This was a theory that had never previously

been the basis of any prosecution (nor apparently has been since).  The theory of the two mortgage-fraud charges, meanwhile, was that Ms. Mosby had made false statements in connection with obtaining the mortgages on the two Florida homes.

The district court severed the perjury and mortgage-fraud charges, recognizing the potential for undue prejudice if everything were tried together. The jury at the perjury trial convicted on both counts; the jury at the mortgage-fraud trial convicted on only one of seven.

More specifically, the mortgage-fraud jury rejected prosecutors' theory as to six of the seven alleged misrepresentations.  The one conviction, however, cannot stand, for several independent reasons.  First, the jury instructions on venue allowed jurors, in direct contradiction of this Court's precedent, to find venue based on preparatory acts (rather than essential conduct elements) having occurred in Maryland.  Second, under the correct standard, there was legally insufficient evidence of venue.  Third, the district court—reversing a pre-trial ruling— erroneously allowed extensive cross-examination of Ms. Mosby about the details underlying the perjury convictions, after concluding that one sentence in her direct testimony (expressing remorse for not having testified at the first trial) had opened the door to such questioning.  The court also told jurors they could use the perjury convictions like "any other piece of evidence," i.e., as substantive evidence of guilt.

The perjury convictions should likewise be set aside. They should have been dismissed pre-trial (as Ms. Mosby requested) because the language at the heart of the allegedly false certifications—"adverse financial consequences"—is fundamentally ambiguous and thus cannot support a perjury charge under this Court's precedent. At trial, moreover, the district court erroneously admitted inflammatory evidence about how Ms. Mosby used the withdrawn funds, even though such evidence was irrelevant to the charges because there were no legal restrictions on how withdrawn funds could be used. And this evidence pervasively tainted the trial because of prosecutors' repeated invocation of it.

Finally, based on the mortgage-fraud conviction, the district court ordered the forfeiture of one of the homes Ms. Mosby had purchased—the other having been sold already to help cover legal expenses arising from this prosecution, which has left her deeply in debt and with almost no significant assets. The forfeiture order should be set aside even if the underlying conviction somehow stands. First, the forfeiture was not statutorily authorized, because prosecutors never proved that Ms. Mosby could not have obtained the home but for the false statement the jury found. Second, the forfeiture is so disproportionate to the nature and scope of the underlying conduct—which caused no cognizable harm—that it violates the Excessive Fines Clause.

This prosecution was ill-advised and ill-conceived from the beginning, and the three convictions and forfeiture order that resulted are infirm. They should all be set aside.

## JURISDICTION

The district court, which had jurisdiction under 18 U.S.C. §3231, entered final judgment (and the forfeiture order) on May 23, 2024. JA332-342. Ms. Mosby timely appealed 14 days later. JA343; *see* Fed. R. App. P. 4(b)(1)(A)(i); Fed. R. Crim. P. 32.2(b)(4)(C). This Court has jurisdiction under 18 U.S.C. §3742 and 28 U.S.C. §1291.

## ISSUES PRESENTED

1.      Whether the mortgage-fraud conviction should be reversed because the district court: (a) gave an erroneous jury instruction on venue, (b) wrongly held there was legally sufficient evidence to prove venue in Maryland, and/or (c) incorrectly ruled that one sentence of Ms. Mosby's direct testimony opened the door to extensive cross-examination about her perjury convictions.

2.      Whether the perjury convictions should be reversed because the district court erroneously: (a) held that the allegedly false statements were not "fundamentally ambiguous" and thus could support a perjury conviction, and/or (b) admitted irrelevant or confusing and unduly prejudicial evidence about Ms. Mosby's use of funds she withdrew from her retirement account.

3.     Whether (if the mortgage-fraud conviction stands) the forfeiture order should be reversed because (a) the relevant property is not statutorily subject to forfeiture and/or (b) the forfeiture violates the Excessive Fines Clause.

## STATEMENT

### A.     Factual Background

#### 1.     *Ms. Mosby's Service As Baltimore City State's Attorney*

After graduating law school in 2005, Marilyn Mosby moved to Baltimore, the hometown of her then-fiancé, Nick.  JA2027-2036.  She spent the first six years of her legal career as a prosecutor with the Baltimore City State's Attorney's Office, earning several promotions (while also giving birth to two daughters). JA2036-2041.  She left the office in 2011, after a new State's Attorney was elected, and became an in-house litigator.  JA2041-2042.  That same year, her then-husband was elected to the Baltimore City Council.  JA2042.

Realizing that her "heart and passion was in criminal justice," Ms. Mosby sought to return to public service in 2013, running for Baltimore City State's Attorney.  JA2042-2043.  Facing skeptics who thought her "too young," "too inexperienced," or likely to "kill [her] husband's political career," she was elected in 2014, overcoming an enormous fundraising disadvantage.  JA2043.  Taking office in January 2015 at age 34, she was the youngest chief prosecutor of any

major American city. JA2046. She was re-elected in 2018 and completed her second term in January 2023.

As State's Attorney, Ms. Mosby was of course a public figure—and a high-profile one. Four months into her first term, she received national attention when her office charged six police officers in connection with the death of Freddie Gray. JA2049. More generally, throughout her tenure, Ms. Mosby oversaw high-profile homicide cases, attended thousands of community events, advocated for criminal-justice reform legislation (in Maryland and nationally), created a Crime Control and Prevention Division and a Conviction Integrity Unit, and (as one would expect) served as the public face of the office she led. JA2044-2047.

> 2. *Amidst Marital Difficulties, Ms. Mosby Prepares For Life After Public Service*

Significant problems arose in Ms. Mosby's marriage after she became State's Attorney. JA2048. One recurring issue was the couple's taxes, which for years Mr. Mosby handled, JA2052. In 2015, for example, Ms. Mosby first learned that she and her husband owed the IRS substantial back taxes. JA2052. And in 2019, she discovered that the couple's tax refund had been withheld to help pay off her husband's defaulted student loan—which she had not known was in default. JA2056. Ms. Mosby sent her husband a separation agreement in October 2019, although they did not immediately divorce as she continued to process both her own feelings and the impact of divorce on their young children. JA2056-2057.

Because of these developments, Ms. Mosby set out (before and during the pandemic) to "establish … financial independence" from her husband, whom she divorced in 2023.  JA2060; *see* JA2057.  And hoping to "posture [her]self" financially for the next phase of her life, she did not intend to seek a third term as State's Attorney.  JA2060.

In 2019, Ms. Mosby incorporated a set of travel-related businesses under the name "Mahogany Elite."  *See* JA2742; JA2745; JA2746.  She aspired to empower underserved populations, including "underserved black families who don't usually have the opportunity to travel outside of urban cities, so they can vacation at various destinations throughout the world at affordable rates."  JA2745.  Mahogany Elite—which Ms. Mosby saw as a "long-term venture," JA2742—did not immediately take on clients or generate revenue, but Ms. Mosby incurred expenses in establishing the companies and in preparing them to become operational.  JA2746.

Ms. Mosby also began looking for a home in her own name, something she had never had.  JA2060.  After offers on Baltimore properties were not accepted, she expanded her search—including to Florida, where she had the assistance of Monique Holston-Greene, a Florida realtor and longtime friend who was like a "big sister" to her.  JA2061.  Ms. Holston-Greene advised Ms. Mosby to obtain

- 7 -

pre-approval for a mortgage and to work with Gilbert Bennett, a Florida mortgage
broker.  JA2062-2063.

### 3.     Ms. Mosby's Withdrawals From Her Retirement Account

During this same period—i.e., while she was looking for a house as part of
seeking to establish financial independence from the man to whom she had sent a
separation agreement—Ms. Mosby made two withdrawals from her account with
the retirement plan (a so-called 457(b) plan) in which she participated as a
Baltimore City employee.

Such withdrawals are normally both taxable as regular income and subject to
a tax penalty.  *See* 26 U.S.C. §457(a)(1); IRS, *Retirement topics: Exceptions to tax
on early distributions* (updated Dec. 8, 2023), https://tinyurl.com/24h7fw75.  But
early in the pandemic, Congress enacted a statute that reduced these tax burdens,
making it easier for qualified people to use funds in their accounts.  In particular,
section 2202(a)(1) of the statute—the 2020 Coronavirus Aid, Relief, and Economic
Security Act, Pub. L. No. 116-136, 134 Stat. 281 ("CARES Act")—permitted
"coronavirus-related" tax-favored withdrawals.  These were available only to
certain categories of individuals, *id.* §2202(a)(4)(A)(ii), including people who
experienced "adverse financial consequences" (an undefined term) from one or
more of several enumerated sources, such as losing a job or child-care because of
COVID, *id.* §2202(a)(4)(A)(ii)(III).  Ms. Mosby first learned about this CARES

Act provision through a lengthy conversation with a representative at Nationwide (her retirement-plan administrator) who told her about the provision and "explained what her options were" under the statute.  JA842.

On May 26, 2020, Ms. Mosby requested a $40,000 coronavirus-related withdrawal from her retirement account.  JA2736-2738.  Ten percent of the withdrawal amount was withheld for taxes because Ms. Mosby chose that default option, instead of directing that no tax (or a different percentage) be withheld.  JA2737.

By signing the distribution-request form, Ms. Mosby certified under penalty of perjury that she met "at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) summarized below."  JA2738.  The form instructed her to "check one" of three boxes; she checked the box next to the following "qualification":

> I have experienced adverse financial consequences stemming from such virus or disease as a result of:
>
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

JA2738.  A fuller excerpt of the form's certification appears in the following screenshot:

- 9 -

Page 3 of 3

**Participant Coronavirus Certification and Distribution Authorization**

The Coronavirus Aid, Relief and Economic Security Act of 2020 ("CARES Act") was signed into law on March 27, 2020. The CARES Act permits qualifying members to receive a coronavirus-related distribution. I understand that I may receive a distribution of up to $100,000 if I am a qualified individual. By making this request, I acknowledge that the amount of coronavirus-related distribution(s) which I may obtain from The City of Baltimore Deferred Compensation Plan is limited to the amount of $100,000 and that I am not exceeding this limit. I further acknowledge that the City of Baltimore Deferred Compensation Plan is relying on my certifications in determining that I qualify for a coronavirus-related distribution and that I will not exceed the applicable limit.

By signing this form, I certify that I meet at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) summarized below: (check one)

☐ I have been diagnosed with the virus SARS-CoV-2 or with coronavirus disease 2019 (COVID-19) by a test approved by the Centers for Disease Control and Prevention; or

☐ I have a spouse or dependents diagnosed with such virus or disease by such a test; or

☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:

- Being quarantined, furloughed or laid off
- Having reduced work hours
- Being unable to work due to lack of child care
- The closing or reduction of hours of a business I own or operate

**Additional Acknowledgments**

I acknowledge that this distribution is subject to ordinary income taxes and any State or Federal income taxes withheld will be reported on a form 1099-R. As listed in the Income Tax Withholding section on page 2 of this form, I understand that 10% will be withheld for Federal Income Tax unless I elected otherwise. To the extent otherwise applicable, I understand that the CARES Act waives the 10% early withdrawal penalty for coronavirus-related distributions. The CARES Act also permits the Federal tax on the distribution to be apportioned over a three-year period. The City of Baltimore Deferred Compensation Plan has advised me to talk with my personal tax consultant about how this distribution will affect my individual taxes and what repayment rights I have under the CARES Act.

I consent to a distribution as elected above and affirm under the penalties for perjury the statements and acknowledgments made in this request. I understand that the terms of the plan document will control the amount and timing of any payment from the plan.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

Signature (required): _____  Date: 5/26/20

NOTE: Adobe Signature is not permitted.

**NOTE:** The full text of the CARES Act can be found at https://www.congress.gov/bill/116th-congress/house-bill/748/text

JA2738.

On December 29, 2020, Ms. Mosby requested another coronavirus-related

withdrawal, of $50,000, from her retirement account. JA2739-2741. The two

withdrawals thus totaled $90,000—under the $100,000 annual limit for

coronavirus-related distributions. CARES Act §2202(a)(2)(A). Again, she opted

to allow the 10% income-tax withholding. JA2740. And again, she checked a box

certifying that she had "experienced adverse financial consequences." JA2741.

The relevant language on the first and second forms was identical. *Compare* JA2738 *with* JA2741.

### 4. *Ms. Mosby's Purchases Of Two Florida Homes*

In September 2020, Ms. Mosby purchased a home in Kissimmee, Florida. JA2064-2065; JA2068-2069. The closing was a "monumental" occasion for her and her daughters, as she finally had a home in her own name. JA2068-2069.

Soon after the Kissimmee closing, Ms. Holston-Greene brought Ms. Mosby another opportunity to buy, in a subdivision condominium in Longboat Key, Florida. JA2072-2073. Ms. Holston-Greene regarded the four-condominium subdivision as a "unique opportunity" for an "all-black venture" in an area that is under one percent black. JA2073. Ms. Mosby purchased one condominium, Mr. Gilbert (the broker) bought another, and Ms. Holston-Greene bought the remaining two. JA2074.

Ms. Mosby had distinct plans for her two Florida properties. She envisioned the Kissimmee home as a resource for her daughters and for family vacations, JA2065; JA2074, whereas the Longboat Key condominium was an "escape"—a place of "solitude" and "solace," JA2074. She designed and oversaw renovations to what had previously been an "outdated" condominium, resulting in a home she "was really proud of" because she "pretty much did it on [her] own." JA2074.

In November 2021, Ms. Mosby sold the Kissimmee home "in the face of mounting legal bills, including from [her] prior counsel in this case." JA306. The Longboat Key condominium is now her only significant asset—she is otherwise deeply in debt—and has generated much-needed rental income during some periods when she is not using it. JA307.

### B.   Procedural History

#### 1.   Indictment And Severance

Ms. Mosby was indicted in January 2022. JA1. The superseding indictment charged two perjury counts, premised on the certifications on the withdrawal forms that she had experienced "adverse financial consequences." JA42-46; JA52-55. It also charged two counts of mortgage fraud, premised on representations allegedly made in her applications for mortgages on the Florida homes. JA47-51; JA56-60. The relevant alleged misrepresentation appeared in a "gift letter" submitted with her mortgage application for the Longboat Key condominium; the letter allegedly misrepresented that Ms. Mosby "had received a $5,000 gift from her husband to be applied toward the purchase," JA60. The superseding indictment also stated that the government would seek forfeiture of "any property constituting or derived from" proceeds that Ms. Mosby "obtained directly or indirectly as a result of" a charged offense. JA61; *see* 18 U.S.C. §982(a)(2).

The district court agreed to sever the perjury and mortgage-fraud charges. JA181-184. It ruled that Ms. Mosby had "made a strong showing of prejudice to warrant severance," JA181, establishing "'a serious risk that a joint trial'" would prevent the jury from "'making a reliable judgment'" about her guilt or innocence, JA183.

### 2. *Perjury Trial*

The perjury trial was held in late 2023. JA23. Before trial, Ms. Mosby moved to dismiss the charges, arguing that the term "adverse financial consequences" in the withdrawal form's certification was "fundamentally ambiguous"—i.e., was "not a phrase with a meaning about which men of ordinary intellect could agree," *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012)—and "thus insufficient to support a perjury charge." JA74-75 (citing cases). The court denied the motion. JA159.

Ms. Mosby also moved pre-trial to exclude "evidence regarding how her withdrawn 457(b) funds were used." JA108. Such evidence was irrelevant, she argued, because neither the CARES Act nor anything else placed limits on how money withdrawn under that statute could be used. JA108. And even if such evidence was not irrelevant, she argued, its marginal probative value was substantially outweighed by unfair prejudice, confusing the jury and wasting time during trial. JA112. The court denied the motion, deeming the evidence "relevant

to determining whether [Ms. Mosby] experienced 'adverse financial consequences' due to" COVID-19.  JA156.  The court further stated that, although Ms. Mosby had "argue[d] with some persuasion that evidence about how she used the withdrawn funds could elicit jealousy or misgivings by the jury, such concerns d[id] not substantially outweigh the probative value of this evidence."  JA156-157. The court did not substantively address Ms. Mosby's argument about the danger of confusing the issues.

Throughout the trial (at which Ms. Mosby elected not to testify), prosecutors relied heavily on her use of the withdrawn money to help make down payments on the Florida homes.  In closing, for example, the prosecution told jurors that Ms. Mosby had taken "advantage of the situation to commit perjury in order to access $90,000 to purchase a million dollars['] worth of Florida vacation homes."  JA810. Indeed, the prosecution referred repeatedly to Ms. Mosby supposedly buying "two Florida vacation homes," JA810, when "[s]he already had a home," JA814.  Ms. Mosby, the prosecution reiterated minutes later, "took the money and used it to purchase two vacation homes, a hundred percent of the money."  JA818.

Jurors were not instructed, as Ms. Mosby had requested, that the CARES Act "permitted a 457(b) participant to use withdrawal funds for any purpose she wished."  JA794-797.  The jury found Ms. Mosby guilty on both perjury counts. JA187.

### 3.     Mortgage-Fraud Trial

a.     The mortgage-fraud trial began in January 2024, two months after the perjury trial concluded.  Before trial, the district court denied Ms. Mosby's motion to preclude prosecutors from cross-examining her about the perjury convictions if she testified, holding that "the *fact* of" the convictions bore on her credibility. JA199.  But the court excluded, under Rule of Evidence 404(b), evidence about the convictions' underlying details, deeming those details neither "intrinsic" to the mortgage-fraud charges nor relevant to a proper Rule 404(b)(2) purpose (such as knowledge)—and alternatively ruling that any probative value was substantially outweighed by the danger of unfair prejudice.  JA203-205.  The court also permitted evidence showing that the down payments for the Florida homes came from retirement funds withdrawn pursuant to the CARES Act, but precluded the prosecution from implying that those withdrawals were the basis for the prior convictions.  JA203.

Ms. Mosby testified at the mortgage-fraud trial.  As to the gift letter (mentioned earlier) that included one of the alleged misrepresentations, she explained that an accounting mistake had left her $5,000 short of what she needed to show the lender she was "clear to close," meaning she was authorized to proceed to consummation because she had fulfilled the lender's underwriting requirements. JA2080; *see* JA1314.  As she would not obtain her next paycheck until just five

days before closing, her broker suggested she obtain a gift letter from her husband that would cover the $5,000 by the scheduled closing date. JA2081; JA2062. She further testified that her then-husband had assured her he could provide $5,000 before the closing, JA2081-2082, and thus he signed the gift letter on February 10 (two days before she received $5,000 in her own paycheck) stating that he would make "a gift of $5,000 to be transferred AT CLOSING," JA2747.

In concluding her direct testimony, Ms. Mosby stated that she had perjury convictions she intended to appeal. JA2089. Her counsel then asked why she was testifying, and she responded: "Because I regret not testifying before, and I want this jury to hear my truth." JA2089.

Before cross-examination, prosecutors argued to the court that this sentence opened the door to more expansive use of the perjury convictions, because it supposedly implied "that the perjury conviction that's being put in to undermine her credibility should be undermined because she didn't testify in that trial," and thus "called into question that there was sufficient evidence to convict her." JA2094. Defense counsel responded that Ms. Mosby had merely explained "why she was testifying" in the mortgage-fraud case and had not "cast any aspersions on" her prior convictions, JA2099, or otherwise tried to "explain [them] away," JA2107.

The court agreed with the prosecution, reasoning that Ms. Mosby's explanation for why she was testifying had introduced a different (unspecified) "scenario." JA2095. The court thus allowed prosecutors to cross-examine Ms. Mosby on the evidence supporting her perjury convictions, including the text of the attestations she had made. JA2100; JA2110-2116. In closing, moreover, prosecutors argued that the false statements underlying the perjury convictions were part of a single scheme to obtain the Florida homes, and that her convictions in the first trial were evidence of her guilt in the second. JA2320-2321.

The court later instructed jurors that Ms. Mosby was "not on trial for crimes not alleged in the indictment," that they could not "consider her perjury convictions as a substitute for proof that [she] committed" mortgage fraud, and that they could not consider the evidence "as proof that [she] has a criminal personality or bad character." JA2459. But, the court went on, they could "consider her perjury conviction[s] as [they] would any other piece of evidence," JA2459—i.e., as substantive evidence of guilt.

b.     During trial, defense counsel argued that, under this Court's precedent, the jury had to be instructed that preparatory acts "cannot provide a basis for venue" and that, therefore, "mere preparation of a false statement cannot provide a basis for venue" in a mortgage-fraud prosecution. JA241 (citing *Reass v. United States*, 99 F.2d 752 (4th Cir. 1938), and *United States v. Sterling*, 860 F.3d

- 17 -

233 (4th Cir. 2017)).  Instead, counsel argued, the jury had to unanimously find

that conduct essential to the charged offense occurred in Maryland.  JA238.  The

court disagreed (and rejected the defense's proposed instruction), instead

instructing that the government's venue burden was to prove that "any act in

furtherance of the crime occurred within" Maryland.  JA2439.

> c.    The jury found Ms. Mosby guilty on the mortgage-fraud count

relating to the Longboat Key home and not guilty on the count relating to the

Kissimmee home.  JA290-291.  The guilty finding rested on only one allegedly

false statement: the statement in the gift letter that Ms. Mosby's then-husband had

"made a gift of $5,000 to be transferred AT CLOSING."  JA291.

> Ms. Mosby moved for a judgment of acquittal, arguing that the government

had failed to prove venue in the District of Maryland.  JA214-220.  The court

denied the motion.  JA292.

> ### 4.    Forfeiture And Sentencing

> The court sentenced Ms. Mosby to three years of supervised release on each

perjury or mortgage-fraud count, to be served concurrently, with Ms. Mosby also

confined to her home for the first year.  JA337-338.  The court imposed no fine

because Ms. Mosby by then had enormous debts and could not afford one.

JA2677.  The court did, however, grant prosecutors' motion to forfeit the Longboat

Key home, holding that they had "established by a preponderance of the evidence

that Ms. Mosby obtained [the home] as the result of her criminal conviction."

JA330.  The court rejected Ms. Mosby's arguments that the forfeiture (1) was not

statutorily authorized because the prosecution had not proven that she would not

have obtained the home but for the gift letter; and (2) constituted an

unconstitutionally excessive fine.  JA2521-2523.  Ms. Mosby's motion to stay the

forfeiture during the pendency of this appeal, JA342, remains pending.

## SUMMARY OF ARGUMENT

I.      The Court should reverse the mortgage-fraud conviction.

First, the district court erred in instructing jurors that they could find venue

based on preparatory acts—rather than essential conduct elements of the charged

offenses—having occurred in Maryland.  That instruction is flatly inconsistent with

this Court's precedent.

Second, under the correct standard, there was insufficient evidence of venue;

the government's evidence about Ms. Mosby's presence in Maryland on *irrelevant*

*dates*, or *other people's* presence in Maryland at all, cannot support a venue

finding.

Third, the district court, reversing a pre-trial ruling, erroneously allowed

prosecutors to cross-examine Ms. Mosby extensively about the details of her

perjury convictions (details the prosecution hammered to the jury).  The court's

rationale for doing so was that Ms. Mosby had "opened the door" to such

questioning and argument by saying, in one sentence of her direct testimony, that she regretted not testifying in the first trial. The court's reading of that testimony as impugning the prior convictions is utterly indefensible, and was manifestly not harmless error.

II.    The Court should also reverse Ms. Mosby's perjury convictions.

First, the ostensibly false statements at issue are "fundamentally ambiguous" and thus cannot support a perjury prosecution.

Second, the district court reversibly erred by declining to exclude evidence about Ms. Mosby's use of the funds she withdrew from her retirement account. That evidence was irrelevant to the elements of the charges. Alternatively, any marginal probative value was substantially outweighed by the danger that it would unfairly prejudice Ms. Mosby (a danger the court itself had repeatedly recognized) and/or confuse the jury.

III.    The forfeiture order cannot stand even if the mortgage-fraud conviction does.

First, the forfeiture of Ms. Mosby's Longboat Key home lacks the nexus to her charged conduct that the statute requires. The government never proved that but for the false statement the jury found, Ms. Mosby would not have been able to obtain the home.

Second, the forfeiture is so disproportionate to the relevant conduct—which caused no cognizable harm to anyone—that it violates the Excessive Fines Clause.

## STANDARDS OF REVIEW

This Court reviews legal questions de novo. Those include whether the district court erroneously denied Ms. Mosby's motion to dismiss, *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014); whether its "jury instructions incorrectly stated the law," *United States v. Smithers*, 92 F.4th 237, 245-246 (4th Cir. 2024); and whether it erred in denying a judgment of acquittal, *United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015). Acquittal was required if the jury's factual findings were "[un]supported by substantial evidence, viewed in the light most favorable to the government." *Id.* And an erroneous jury instruction, timely objected to, requires reversal unless the error was harmless "beyond a reasonable doubt." *Smithers*, 92 F.4th at 251.

This Court reviews evidentiary rulings for abuse of discretion, assessing whether the district court's decision was "guided by erroneous legal principles" or "rests upon a clearly erroneous factual finding." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). An evidentiary error is reversible (i.e., not harmless) unless it is "highly probable that the error did not affect the judgment." *United States v. Gallagher*, 90 F.4th 182, 197 (4th Cir. 2024).

De novo review applies to the forfeiture order's constitutionality, *United States v. Bajakajian*, 524 U.S. 321, 336 (1998), and the court's interpretation of the forfeiture statute, *United States v. Oregon*, 671 F.3d 484, 490 (4th Cir. 2012). Factual findings regarding the forfeiture order are reviewed for clear error. *Bajakajian*, 524 U.S. at 326 n.10.

## ARGUMENT

## I.     THE MORTGAGE-FRAUD CONVICTION SHOULD BE REVERSED

Ms. Mosby's mortgage-fraud conviction should be reversed because the jury instruction on venue was erroneous under binding precedent.  Under the correct standard, moreover, the jury lacked sufficient evidence of venue to convict.  And independent of venue, the district court reversibly erred by ruling that one sentence of Ms. Mosby's testimony, expressing regret for not testifying in the first trial, opened the door to extensive questioning regarding the facts underlying the prior convictions.

### A.     The Venue-Related Errors Each Require Reversal

Venue is no "mere technicality." *United States v. Moran-Garcia*, 966 F.3d 966, 969 (9th Cir. 2020); *accord United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997).  Nor is it just a "matter[] of formal legal procedure." *United States v. Johnson*, 323 U.S. 273, 276 (1944).  "Questions of venue in criminal cases … raise deep issues of public policy," *id.*, which is why "[p]roper venue in criminal

proceedings was a matter of concern to the Nation's founders," *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Indeed, the Constitution "twice safeguards the defendant's venue right." *Id.* Article III instructs that the "Trial of all Crimes … shall be held in the State where … committed." U.S. Const. art. III, §2, cl. 3. And the Sixth Amendment requires trial "by an impartial jury of the … district wherein the crime shall have been committed." *Id.* amend. VI. The Federal Rules "echo the[se] constitutional commands," providing that "'prosecution shall be had in a district in which the offense was committed.'" *Cabrales*, 524 U.S. at 6 (quoting Fed. R. Crim. P. 18).

The district court erred both in instructing the jury on venue and in denying Ms. Mosby's motion for a judgment of acquittal on venue grounds. Each error independently warrants reversal.

>    1.    *The Venue Instruction Erroneously Permitted Jurors To Find Venue Based On Preparatory Acts Alone Occurring In Maryland*

a.    The venue instructions, which told jurors they had to find only that any act *in furtherance of* the charged offenses occurred within Maryland, flouted this Court's precedent holding that venue lies only where an *essential conduct element* occurred. That error was not harmless, so reversal is required.

"Venue," this Court has held, lies "only in a district in which an essential element of the offense took place"; "[a]cts which are merely 'preparatory'" are not

a basis for venue. *Sterling*, 860 F.3d at 240-241. For mortgage-fraud charges, venue lies where false statements were communicated or received: In an analogous fraud case involving a loan application, this Court held that the defendant's "assembling of the material and its arrangement in a written composition containing the misrepresentations" in West Virginia did not create venue there; venue lay only where he "communicated" the misrepresentations. *Reass*, 99 F.2d at 755.

Here, prosecutors urged the district court to disregard *Reass* because "other courts have disagreed with" *Reass*. JA300. But the district court properly declined to do so, recognizing that this Court's precedent was binding without a "'directly applicable Supreme Court holding'" to the contrary. JA301 (quoting *United States v. Dodge*, 963 F.3d 379, 384 (4th Cir. 2020)).

The district court also recognized that under *Reass*, the relevant essential element of the charged offenses was transmitting the gift letter to the lender—not the preparatory acts of drafting the letter or assembling the mortgage application. JA300. The court nonetheless instructed jurors that the government's venue burden was merely to prove that "any act, in furtherance of the [charged] crime, occurred within" Maryland. JA882-883. Jurors thus could have found venue based only on proof that preparatory acts like drafting or signing the gift letter occurred in Maryland.

- 24 -

The venue instruction's inadequacy is confirmed by *Sterling*, which held a near-identical instruction improper. *See* 860 F.3d at 244-245. Jeffrey Sterling was convicted of national-security offenses, including retaining classified information. *Id.* at 238-240. As to venue, the district court instructed jurors that they needed to find "that *at least one act in furtherance of th[e] offense* occurred in" Virginia. *Id.* at 244. That instruction, this Court explained, was impermissibly "ambiguous about whether the jury could find venue based on … preparatory acts," rather than conveying that venue requires proof that "essential conduct elements" were committed in the relevant district. *Id.* at 245. The same is true here.[1]

*Sterling* held that reversal was not required because the erroneous instruction was sufficiently mitigated by "an earlier statement to the jury that the defendant must be tried 'where the offense was committed'"; that prior statement "appropriately conveyed … how to determine venue for crimes like … retention of classified information." 860 F.3d at 245. The district court in *Sterling* had also given a "supplemental instruction" that, this Court held, further "helped dispel any ambiguity, by clarifying that 'willful retention' (and not just mere preparation for

---

[1]    Other circuits have likewise held that actions "merely preparatory or prior to the crime are not probative in determining venue." *United States v. Georgacarakos*, 988 F.2d 1289, 1293 (1st Cir. 1993); *accord United States v. Tzolov*, 642 F.3d 314, 318-319 (2d Cir. 2011); *United States v. Strain*, 396 F.3d 689, 697 (5th Cir. 2005); *United States v. Corona*, 34 F.3d 876, 880 (9th Cir. 1994).

such retention) needed to occur in the [trial district] for the jury to find proper venue." *Id.* Here, there was no "additional guidance" or supplemental instruction that could have "adequately prevented the jury from finding venue based on the situs of preparatory acts." *Id.* The instructions as a whole were thus erroneous.

b.    The erroneous venue instruction was not harmless "beyond a reasonable doubt," *Smithers*, 92 F.4th at 251.

As in *Smithers*, "there is evidence upon which a jury could have reached a contrary finding" here, 92 F.4th at 252—i.e., could have found venue *not* proven under the correct instruction. For example, jurors could reasonably have found that Ms. Mosby *prepared* the gift letter in Maryland but that it was *submitted* to the Florida-based lender by her Florida-based mortgage broker (or his staff). Indeed, the jury heard uncontroverted testimony that Ms. Mosby would have *needed* her broker (or some other professional intermediary) to submit the letter for her, testimony that "someone from the brokerage firm would have [had] to upload [the letter] to [the lender's] system." JA1319-1320. Alternatively, jurors could reasonably have concluded that she prepared the letter in Maryland but submitted it only later—e.g., after she flew to Florida for the closing. JA302; JA2762.

In short, the evidence "could rationally have led to a contrary finding" on venue. *Smithers*, 92 F.4th at 251-252. The erroneous venue instruction was thus not harmless beyond a reasonable doubt.

- 26 -

2.    *The Evidence Was Legally Insufficient To Prove Venue In Maryland*

Reversal is separately required because, under the correct standard, there was legally insufficient evidence of venue.  Ms. Mosby raised this argument in her unsuccessful motion for judgment of acquittal.  JA301-303.

Properly instructed, jurors were required to find by a preponderance of the evidence that an essential-conduct element of the charged offense—transmitting the gift letter—occurred in Maryland.  *See Sterling*, 860 F.3d at 240-241; *Reass*, 99 F.2d at 755.  Prosecutors adduced no direct evidence that Ms. Mosby transmitted the letter from Maryland.  *See* JA301-303.  The circumstantial evidence they relied on instead was legally insufficient.

Viewed in the light most favorable to the government, that evidence showed the gift letter was transmitted on or after February 10, 2021, the date it was signed. To support their theory that the transmission was from Maryland, prosecutors offered records of debit-card and bank-account transactions Ms. Mosby made on February 2, 4, and 8.  *See, e.g.*, JA2757.  But there was no evidence of any financial transaction (or other conduct) by Ms. Mosby in Maryland on February *10*: no evidence that anyone saw her on that date in Maryland, no cell-tower records establishing that she was in Maryland then, no evidence that the letter was submitted on that date from a Maryland-based IP address.

Instead, the government invited the jury to speculate that, because Ms. Mosby (1) spent money on February *4* at a Baltimore grocery store and on February *8* at a Cockeysville restaurant; (2) "was in quarantine with her family in Maryland in *December 2020*, due to the coronavirus pandemic," and (3) "was serving as … State's Attorney in Baltimore, Maryland, as of *December 10, 2020*," she was necessarily in Maryland on February 10, 2021—days (or even months) before or after those events.  JA302-303 (emphases added); *see also* JA2757.  That is manifestly insufficient given that traveling into or out of Maryland can be done in, at most, a matter of hours.

Indeed, it would be "mere guesswork" to rely on evidence of Ms. Mosby's presence in Maryland on adjacent (or not-so-adjacent) dates to infer her location on the relevant date.  *United States v. Purcell*, 967 F.3d 159, 188 (2d Cir. 2020).  This Court deemed similar evidence inadequate in *Sterling*.  There, prosecutors offered evidence that Mr. Sterling lived in Virginia and kept a confidential letter at home, inviting jurors to infer that "the process of communicating, delivering, or transmitting the letter's contents" likely began in Virginia.  860 F.3d at 244.  That circumstantial evidence was insufficient, *Sterling* held, because it lacked an "evidentiary hook to which the jury might attach" the government's inference; prosecutors had "offered no evidence showing how Sterling transmitted or delivered the letter …, including the procedure and location of any transfer," so

"the jury could only speculate" on that critical point. *Id.*; *see also United States v. Mallory*, 337 F.Supp.3d 621, 625-628 (E.D. Va. 2018) (applying *Sterling*). The Second Circuit has similarly held insufficient venue evidence that established only that the defendant had frequently driven through the trial district—not that any relevant conduct had occurred while he was there. *Purcell*, 967 F.3d at 187-188. The government, the court noted, had "point[ed] to no cell-phone record or other evidence pinpointing Purcell's location" at a relevant time. *Id.* at 187. Again, the same is true here.

In denying a judgment of acquittal based on insufficient venue evidence, the district court also pointed to "bank records showing that *Nick* Mosby completed several bank transactions at Maryland financial institutions on February 9, 10, and 11, 2021." JA302 (emphasis added). And prosecutors, the court observed, argued that the records showed that *Marilyn* Mosby "was continually in … Maryland in early 2021." JA302. But putting aside that the question here is not what the government "argued," evidence about where someone *other than* Ms. Mosby (even her spouse) was on particular days is assuredly insufficient to establish where she was—certainly absent any "evidentiary hook to which the jury might attach" the government's proposed inference, *Sterling*, 860 F.3d at 244. That is particularly true given the uncontroverted testimony that the couple's relationship had deteriorated by that time. *See, e.g.*, JA1487-1488; JA1544-1548; JA2056-2057.

- 29 -

Finally, the district court improperly focused on prosecutors' introduction of evidence that Ms. Mosby submitted the gift letter "before she departed Maryland for Florida on February 16, 2021." JA302. Even if jurors believed Ms. Mosby submitted the letter at *some* time before February 16, 2021, it does not follow that she did so on any particular date, much less *from Maryland*. The evidence was simply insufficient to allow a reasonable jury to find that the government had proven venue.

### B.     The District Court Erroneously Admitted Details Of The Perjury Convictions As Substantive Evidence

The mortgage-fraud conviction should be reversed for still another independent reason: The district court abused its discretion by ruling that (1) a single sentence in Ms. Mosby's direct testimony opened the door—the floodgates, in fact—to jurors hearing details about the perjury convictions, and (2) the jury could consider those details like any other evidence, i.e., as evidence of guilt on the mortgage-fraud charge. That was exceedingly prejudicial because the conduct alleged in each trial was the same: making false statements on financial forms in connection with the same property purchases. The court itself had repeatedly recognized this danger of unfair prejudice. *See infra* pp.36-37. Abandoning that position based on a lone sentence in Ms. Mosby's testimony was reversible error.

1.    *The District Court's Pre-Trial Ruling And Mid-Trial Reversal*

As explained, *see supra* p.15, the district court ruled before the second trial that prosecutors could (1) cross-examine Ms. Mosby about the *fact* of the perjury convictions; (2) argue that the convictions suggested an untruthful character; and (3) introduce evidence to show that the down payments on the Florida homes came partly from the CARES Act withdrawals.  JA199; JA203.  However, the court ruled that prosecutors could not tell jurors about "facts underlying" the convictions, including the relevant alleged false statements or how the withdrawn funds enabled Ms. Mosby to purchase homes in Florida.  JA203-205.  Prosecutors therefore could not tell jurors that Ms. Mosby was convicted for making false statements in connection with withdrawing funds that she used to buy the same home the gift letter was allegedly meant to help her purchase.  That ruling influenced Ms. Mosby's decision to testify.  *See* JA1021.

On direct examination, Ms. Mosby acknowledged the perjury convictions, ending with the following exchange:

> Q.    [W]hy are you testifying today?
>
> A.    Because I regret not testifying before, and I want this jury to hear my truth.

JA2089.  Prosecutors argued that this exchange—alone—warranted the court revisiting its ruling about the scope of cross-examination on the prior convictions. JA2094.  The court agreed, ruling that Ms. Mosby's expression of regret had

- 31 -

introduced an (unspecified) different "scenario," thereby opening the door to cross-examination about the facts underlying the perjury conviction.  JA2095.

Prosecutors then asked *dozens* of questions to elicit testimony that Ms. Mosby had been convicted of falsely stating on withdrawal forms (which prosecutors displayed and had her read to the jury) that she had suffered "adverse financial consequences."  And further harping on the use of the withdrawn funds (despite the lack of any legal restrictions on that use), prosecutors had her confirm that she had used the funds to purchase the Florida homes.  JA2113; JA2116.

Prosecutors again took advantage of the district court's reversal in closings, arguing that the prior convictions were all part of one scheme.  "Defendant," they argued, "perjured herself for a very particular reason:  She did it so she could obtain the down payments that were used to purchase the" Florida homes. JA2320; *accord* JA2321.  The court then instructed jurors that they could "consider her perjury conviction[s] *as [they] would any other piece of evidence*."  JA2459 (emphasis added).

### 2.    *The District Court Abused Its Discretion By Reversing Its Pre-Trial Ruling*

Ms. Mosby's single sentence expressing regret about not testifying at the first trial opened no door, let alone to extensive questioning about the perjury convictions.  The district court did not explain what part of the statement it thought opened the door (nor what new "scenario" had been introduced), simply

- 32 -

"agree[ing] with the Government," JA2099.  Prosecutors had argued that Ms.
Mosby's statement implied she "believe[d] that there was inadequate evidence to
convict her in the earlier trial" and was an assertion that "the prior jury didn't hear
her truth and therefore … the perjury conviction is invalid."  JA2094.  That is not a
remotely defensible interpretation of the sentence.

Ms. Mosby's expression of "regret" for not having testified the first time
conveyed exactly that, her wish that she *had* testified before—nothing more.
Likewise, her statement that she wanted "this jury to hear my truth" conveyed that
she did not want to repeat what she regarded as her mistake in not testifying
before.  She never referred to the evidence at (or the outcome of) the first trial, let
alone implied the evidence was insufficient or the outcome wrong.  If anything, her
reference to "my truth," as opposed to "the truth," made clear that she was *not*
saying the first jury had not heard "the" truth, only her truth, i.e., her side of the
story.  The government's contrary argument that the district court embraced simply
makes no sense.

Ms. Mosby's statement was certainly nothing like what courts have held
opened the door to evidence of prior bad acts, such as claims that there was not
"any proof" the defendant committed the prior offense, *United States v. McLaurin*,
764 F.3d 372, 383-384 (4th Cir. 2014), or testimony implying there was no
evidence of prior bad conduct to support the investigation of a later offense, *see*

- 33 -

*United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018). Indeed, Ms. Mosby's statement even fell short of what courts have said is *not* enough to open the door— e.g., a defendant's testimony that he was convicted, is appealing, and did not commit the crime, *United States v. Robinson*, 8 F.3d 398, 410 (7th Cir. 1993). Ms. Mosby did not minimize (or, again, even discuss) the evidence behind the prior convictions, nor proclaimed her innocence. She merely expressed personal regret about not testifying.

Even when a defendant "opens the door," moreover, "the new evidence must be 'reasonably tailored,'" *Birchette*, 908 F.3d at 61, and cannot advance a prohibited purpose, like showing conduct in accordance with the prior act, *see United States v. Hall*, 858 F.3d 254, 260 (4th Cir. 2017). The government may not "harp on the witness's crime" and "parade it lovingly before the jury." *Robinson*, 8 F.3d at 410. That is what happened here; prosecutors had Ms. Mosby read in full her distribution attestations, JA2112-2115, for no purpose other than to prejudice the jury, and improperly "shift[ed] the focus" to her "conviction in a previous case," *Robinson*, 8 F.3d at 410. Even if the door was opened, it was an abuse of discretion to permit this protracted and prejudicial exchange.

### 3. The Error Was Not Harmless

In evaluating whether it is "highly probable" that an error was harmless, this Court considers "the closeness of the case," "the centrality of the issue [the error]

affected," and "the steps taken to mitigate" the error. *Gallagher*, 90 F.4th at 197. Here, the case was close, the inappropriately admitted evidence was central, and the court's attempt to mitigate only exacerbated the error.

a.    That the mortgage-fraud case was close is clear from the jury's not-guilty verdict as to six of the seven allegedly false statements. JA290-291. Jurors, moreover, deliberated for nearly a day. JA289; JA2471-2474. When a jury deliberates for "hours before reaching a guilty verdict" in a case that turns on credibility (as this one did, for reasons explained in the next paragraph), and does not find guilt to the extent prosecutors urged, the admission of "obviously damaging" evidence of prior related conduct is not harmless. *United States v. Sanders*, 964 F.2d 295, 299-300 (4th Cir. 1992).

b.    The challenged ruling went directly to Ms. Mosby's credibility, which was central to the case. To prove mortgage fraud, the government had to show beyond a reasonable doubt that she "knowingly" made a false statement to "influence a bank's action." JA304. Prosecutors presented no "smoking gun" evidence of knowledge—no testimony from Ms. Mosby (or another witness) that she knew, when signing the gift letter, that her then-husband would not give the promised $5,000.

In fact, the only testimony regarding Ms. Mosby's knowledge was (1) Nick Mosby's testimony that he *had* promised to "give her the $5,000" at closing (and

could make that payment), JA1549-1550; (2) Ms. Mosby's testimony confirming

this, JA2174; and (3) her explanation that she had wired him $5,000 after receiving

her paycheck a few days later not because his gift promise had been a lie but

because she was "[n]ot necessarily confident that he would have the $5,000 at

closing" and "didn't want to chance it." JA2082. Prosecutors, by contrast,

presented only a copy of the letter and bank statements showing the undisputed

fact that she wired the $5,000. *See* JA2771; JA1419. Even if that sufficed to

support the conviction, "the prejudicial nature of" the erroneously admitted

evidence "may have swayed the jury's judgment," which requires reversal. *Hall*,

858 F.3d at 279-280. Put simply, when jurors learned the prior convictions were

for false statements on financial forms not unlike the gift letter, made to obtain

financing for the same property to which the letter related, they were far more

likely to believe that the letter contained a false statement.

The district court itself had recognized the prejudicial risk of "jealousy or

misgivings" that evidence of how Ms. Mosby used the funds could incite, JA156-

157, relying on the risk of unfair prejudice both to sever the two trials, JA182-184,

and to deny prosecutors' initial request to introduce this evidence, JA204. This

Court has previously rejected a harmlessness argument in highly similar

circumstances, i.e., where the district court reversed itself (on the ground that the

defendant opened the door) and admitted evidence the court "itself initially

- 36 -

recognized" would be "unduly prejudicial." *United States v. Johnson*, 996 F.3d 200, 219-220, 223 (4th Cir. 2021). The same outcome is warranted here.

c.    The third harmlessness factor—mitigation—also supports reversal. Prior-conduct evidence, this Court has explained, inflicts prejudice that "a limiting instruction cannot cure." *Hall*, 858 F.3d at 279. And even if a genuinely mitigating instruction *could* render the erroneous admission of such evidence harmless, the instruction here exacerbated rather than cured the prejudice.

The court's instruction was internally inconsistent. It told jurors they could not consider the "perjury convictions as a substitute for proof that the defendant committed the crime charged" or "proof that the defendant has a criminal personality or bad character"—but then stated, without qualification, that they could consider evidence about the convictions as they would "any other piece of evidence." JA2462. These instructions were contradictory because "other piece[s] of evidence" *could* constitute "proof that the defendant committed the crime charged" or "proof that the defendant has a criminal personality or bad character." JA2459. The "any other piece of evidence" component of the instruction thus negated the rest.

Worse yet, the instructions addressed only the prior "convictions." JA2459. They said nothing about the evidence *underlying* those convictions—including evidence that Ms. Mosby had used the funds to purchase vacation homes. Jurors

heard no instruction restricting their use of that evidence.  They were thus free, for example, to rely on the fact that Ms. Mosby had been convicted of a false statement on one pair of financial documents (the withdrawal forms) to find that she had made a false statement on another (the mortgage application).  Indeed, the government urged jurors to do just that.  *See supra* pp.17, 32.  Even if the instruction had potential to mitigate error, then, "the government's improper use of the prior convictions during its closing argument … preclude[s] a finding of harmlessness" by "undermin[ing]" whatever theoretical limiting effect the instruction could otherwise have had.  *Hall*, 858 F.3d at 281-282.  This factor, like the other two, therefore calls for reversal.

*    *    *

A final point on the mortgage-fraud conviction:  All the foregoing arguments aside, the conviction must be reversed if the perjury convictions fall.  The extensive evidence regarding those convictions obviously "would have been inadmissible" had the convictions not then been valid, and its admission was assuredly prejudicial.  *United States v. Barringer*, 25 F.4th 239, 247-249 (4th Cir. 2022).

- 38 -

## II.    THE PERJURY CONVICTIONS SHOULD BE REVERSED

### A.    The Term "Adverse Financial Consequences" Is Fundamentally Ambiguous And Therefore Cannot Support Perjury Charges

Ms. Mosby's perjury convictions rest on her certifications that she had suffered "adverse financial consequences" from one of four enumerated categories of sources on the withdrawal form. But the form's use of "adverse financial consequences" was "fundamentally ambiguous," so under this Court's precedent it cannot support a perjury conviction. The district court accordingly erred in denying Ms. Mosby's motion to dismiss the charges.

"The answer to a fundamentally ambiguous question," this Court has held, "may not, as a matter of law," support perjury convictions. *Sarwari*, 669 F.3d at 407; *accord United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986). That principle applies to government-supplied documents like the withdrawal forms here: The government "may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate." *United States v. Manapat*, 928 F.2d 1097, 1102 (11th Cir. 1991).

A phrase is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time." *Sarwari*, 669 F.3d at 407. The Third Circuit, for example, has held the term "PREVIOUS ADDRESS (Last 5 Years)" on a credit-card

- 39 -

application fundamentally ambiguous because "address" could mean either "domicile" or "primary residence."  *United States v. Ryan*, 828 F.2d 1010, 1016 (3d Cir. 1987) (subsequent history omitted).

Here, "adverse financial consequences" is not a phrase "with a meaning about which men of ordinary intellect could agree," *Sarwari*, 669 F.3d at 407.  The term was not defined on the withdrawal forms, JA2741, in the CARES Act, or in IRS guidance.  Indeed, it does not appear to have been defined anywhere.  And the term is "open to numerous interpretations," *Ryan*, 828 F.2d at 1017—as tax professionals and lawyers recognized soon after the CARES Act's enactment.  One leading commentary, for example, advised that determining whether adverse financial consequences existed was "highly dependent upon a *subjective interpretation* of the facts … of each situation," adding that taxpayers requesting withdrawals on that basis "could be at risk of a different interpretation by the IRS until clear guidance is issued."  Goldman Sachs, *CARES Act: Penalty-free withdrawals* (Sept. 9, 2020) (emphasis added), https://tinyurl.com/47z86kvm.

The district court instructed jurors that "[a]dverse financial consequences means an unfavorable or negative outcome related to money."  JA901.  But that definition does not encompass the full range of meanings that a person of ordinary intellect might give the term.  The word "finance," after all, has multiple meanings, including "the obtaining of funds or capital."  Merriam-Webster, *Finance*,

https://tinyurl.com/4836mjxr (visited Aug. 19, 2024).  Ms. Mosby therefore could have reasonably understood "financial consequences" to encompass not only pandemic-related losses of extant assets or future revenue from her nascent travel business (Mahogany Elite), but also a pandemic-related loss of potential capital investments or other business opportunities—i.e., opportunities to grow and lay groundwork for the business as she prepared to begin operating it upon leaving public service.  The latter interpretation encompasses business-related "consequences" that are not easily quantifiable or necessarily directly "related to money"—to use the district court's cramped definition—but that readers of the form could reasonably deem "financial."[2]

The forms' fundamental ambiguity was not resolved by the fact that they stated that a plan participant's "adverse financial consequences" had to stem from one of four enumerated categories of sources.  *See supra* pp.8-10.  (At trial, the defense argued that the source of Ms. Mosby's adverse financial consequences was the "closing or reduction of hours" of Mahogany Elite.  JA850-851.)  That enumeration limited the *sources* of qualifying "adverse financial consequences," but did nothing to clarify the meaning of that term.

---

[2]     The evidence showed that Ms. Mosby had made financial commitments to her new business despite not relying on it as revenue source.  For instance, she had paid hundreds of dollars in corporate filing fees and taxes.  JA612-614.

Because "adverse financial consequences" is fundamentally ambiguous, and because that phrase underlies the perjury convictions, those convictions must be reversed.  *See Sarwari*, 669 F.3d at 407.

### B.     Evidence Of Ms. Mosby's Use Of The Withdrawn Funds Was Inadmissible

Before trial, Ms. Mosby moved to exclude evidence and argument about her use of the withdrawn retirement funds, including to make down payments on the Florida homes.  JA108.  Such evidence, she argued (referred to here as use evidence), was irrelevant or, alternatively, created too great a risk of unfair prejudice and confusion of the issues.  JA108.

The district court denied the motion, reasoning that the evidence was "relevant to determining whether [Ms. Mosby] experienced 'adverse financial consequences' due to the coronavirus—a central issue … in this case."  JA156-157.  As to Ms. Mosby's alternative argument, the court acknowledged that "evidence about how she used the withdrawn funds could elicit jealousy or misgivings by the jury," but nonetheless refused to exclude the evidence, simply twice stating the *conclusion* that the probative value was not substantially outweighed by the risk of unfair prejudice.  JA156-157.  The court never substantively addressed Ms. Mosby's argument about jury confusion.

Admitting the use evidence was reversible error.  That evidence was irrelevant because neither the CARES Act nor anything else placed limits on how

withdrawn funds could lawfully be used.  And even if the evidence had any

relevance, its probative value was "substantially outweighed" by its tendency to

unfairly prejudice and confuse the jury, Fed. R. Evid. 403.

### 1.   The Use Evidence Was Irrelevant

The key factual question in the first trial was whether Ms. Mosby knowingly

made a false statement in certifying that she had suffered "adverse financial

consequences" from an enumerated source before submitting each withdrawal

form.  What she did later with the withdrawn funds was entirely irrelevant to that

inquiry.  Ms. Mosby made no attestation (nor did the form ask for one) about the

use to which the funds would be put, including whether they would be used

specifically to address or mitigate the adverse financial consequences.  Nor did she

attest (and again the form did not ask her to) that the withdrawn amounts

corresponded in some way to the magnitude of the adverse financial consequences

or her resulting financial need.  Indeed, contemporaneous IRS guidance explained

that distributions under the CARES Act were (1) *not* limited "to amounts

withdrawn solely to meet a need arising from COVID-19," (2)"permitted without

regard to the qualified individual's need for funds," and (3)"not required to

correspond to the extent of the adverse financial consequences experienced by the

qualified individual."  JA94.  Even prosecution witness David Randall (an

administrator of the relevant 457(b) plan) agreed there were no restrictions on how Ms. Mosby could use her withdrawn funds.  JA475; JA817.

The district court's only response to this was that how Ms. Mosby used the funds bore on whether she had experienced "'adverse financial consequences' due to the coronavirus—a central issue."  JA156.  That is wrong; the use of the funds to make down payments on property does nothing to make it less or more likely that Ms. Mosby had experienced (possibly weeks or months earlier) *any* adverse financial consequences.  Again, that term was not defined anywhere—and certainly never defined to exclude some minimum threshold of adverse financial consequences.  Someone who suffered a loss of even a hundred dollars (or ten, or one) from one of the sources listed on the form was therefore entitled under the CARES Act to withdraw the maximum amount available.  JA475.

There was no basis for the district court's assertion that evidence of Ms. Mosby having used withdrawn funds to make down payments does anything to exclude the possibility that she had experienced a qualifying—even if extremely small—adverse financial consequence.  That is especially true given the weeks that passed between when Ms. Mosby signed the forms and when she made the down payments.  The evidence was simply irrelevant, and thus inadmissible.

2.    *Any Probative Value Was Substantially Outweighed By The Risk Of Unfair Prejudice And Jury Confusion*

Alternatively, any marginal probative value the use evidence had was substantially outweighed by the risk of unfair prejudice and/or confusing the jury.

Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  That is what happened here.  At trial, the government used the evidence not just for the reason the court had deemed it relevant (supposedly disproving that Ms. Mosby had suffered adverse financial consequences when she made the attestations), but to persuade jurors that she used the money for impermissible purposes—even though there *were* no impermissible purposes.  For example, the government argued in closing that Ms. Mosby had committed perjury for "her own private gain." JA810.  That inflammatory assertion had nothing to do with the charged offenses (or the district court's relevance theory); Ms. Mosby's "purpose" in making the allegedly perjurious statements was irrelevant to her guilt or innocence.  Likewise, the government argued that Ms. Mosby "took advantage of the situation to commit perjury in order to access $90,000 to purchase a million dollars['] worth of Florida vacation homes." JA810.  Again, that statement has nothing to do with any of the actual *elements* of the charged offenses, or, again, to the district court's relevance theory.  It was purely an attempt to inflame jurors,

with the hope that, as defense counsel argued in seeking exclusion, one or more "members of the jury—still reeling from the hardships of a 2½-year-and-counting global pandemic—may be incensed by the notion of someone purchasing vacation homes during that time." JA131. Nor was this an isolated incident. To the contrary, the government persistently characterized the properties as Ms. Mosby's "two Florida vacation homes." JA810.

In short, the government's repeated invocation of the use of the distributions encouraged jurors to convict not because Ms. Mosby had committed perjury but because they viewed her as a wealthy woman and a public figure motivated by greed. JA849-850. Such appeals to animosity toward the rich (putting aside that Ms. Mosby was not in fact wealthy) are improper. *See Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990); *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980). And given the (at best) low probative value the use evidence had regarding the actual elements of the charged offenses, the risk that the jury was swayed by those inflammatory appeals "substantially outweighed" that value.

Though no more is needed to find error, the use evidence also risked jury confusion, i.e., risked "distract[ing] the jury" from the central questions before it, *United States v. Zayyad*, 741 F.3d 452, 460 (4th Cir. 2014). The central question here was, as discussed, whether Ms. Mosby knowingly stated falsely that she had experienced "adverse financial consequences" from one of the four enumerated

sources.  Allowing evidence (and pervasive government argument) about how Ms.

Mosby used her withdrawn funds likely misled jurors into believing that their task

was to determine whether the adverse financial consequences Ms. Mosby

experienced were severe enough to justify the amounts withdrawn, and/or whether

the money was used for a permissible purpose.  As explained, however, withdrawn

funds could be used for *any* purpose, and the amounts withdrawn did not have to

correspond (even remotely) to the degree of adverse financial consequences

experienced.  *See supra* pp.43-44.  Again, given the (at best) low probative value

the use evidence had regarding the charged offenses, and the frequency with which

the government referred to these irrelevant considerations, the risk of jury

confusion substantially outweighed any probative value.  In any event, by ignoring

altogether this aspect of Ms. Mosby's Rule 403 argument—i.e., by "fail[ing] to

consider [a] judicially recognized factor[] constraining its exercise of discretion"—

the court necessarily abused its discretion.  *United States v. Dillard*, 891 F.3d 151,

158 (4th Cir. 2018).

### 3.    *The Error Was Not Harmless*

Applying the three *Gallagher* factors for harmlessness, *see supra* pp.34-35,

makes clear that admitting the use evidence was not harmless.

As to "the centrality of the issue affected by the error," *Gallagher*, 90 F.4th

at 197, prosecutors emphasized the use evidence heavily throughout trial, including

during openings and closings. Indeed, the evidence was a core theme of their case. During opening statements, for example, the government described Ms. Mosby's use of the withdrawn funds as purchasing "half million dollar vacation homes in Florida." JA426-428. An FBI forensic account expert testified in its case-in-chief about the amount Ms. Mosby had spent to close on both "vacation homes." JA576. And in closing, the prosecution argued that Ms. Mosby committed perjury for her own private gain, emphasizing again that she had withdrawn $90,000 "to purchase a million dollars['] worth of Florida vacation homes." JA810. The improper admission of evidence central to the government's presentation warrants reversal. *See, e.g.*, *United States v. Johnson*, 600 F.App'x 872, 874-876 (4th Cir. 2015) (per curiam); *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 53 (4th Cir. 1993); *United States v. Blackshire*, 538 F.2d 569, 571 (4th Cir. 1976).

As to "the closeness of the case," *Gallagher*, 90 F.4th at 197, the jury evidently struggled with its decision. After hearing just three days of testimony, the jury took nearly six hours to reach a verdict. JA185; JA915. That amount of deliberation in a "narrow, single-issue case" indicates closeness. *United States v. Ibisevic*, 675 F.3d 342, 354 (4th Cir. 2012) (four hours); *accord United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980) (five hours). Additionally, because Ms. Mosby had not testified, the jury needed to assess her intent through circumstantial evidence. The lack of any direct evidence makes it even more likely that jurors

were swayed by the government's persistent reference to improper evidence. And even if the prosecution's case had been much stronger, that would not preclude the conclusion that the error was harmful. *See Johnson*, 600 F.App'x at 875.

Finally, insufficient steps were taken "to mitigate the effects of the error," *Gallagher*, 90 F.4th at 197. Although the jury was instructed that CARES Act withdrawals were permitted "without regard to" Ms. Mosby's *need* for the funds so long as she was "eligible to make a withdrawal," JA902, that did not cure or mitigate the unfair prejudice and confusion caused by the evidence and relentless argument about her *use* of the funds. What was needed was an additional instruction like the one the defense proposed: "The CARES Act permitted a 457(b) participant to use withdrawal funds for any purpose she wished." JA794. But the district court rejected that proposal. JA797. The omission of any such instruction confirms that the error was not harmless.

## III.    THE COURT SHOULD REVERSE THE FORFEITURE ORDER

Based on the mortgage-fraud conviction, the district court ordered forfeiture of Ms. Mosby's Longboat Key home. JA330. While the forfeiture order automatically falls if the conviction does, *United States v. Cherry*, 330 F.3d 658, 670 (4th Cir. 2003), the order should be reversed regardless. The forfeiture of Ms. Mosby's home, for a misrepresentation about the source of 1% of her down payment, is not statutorily authorized and is unconstitutionally excessive.

### A. The Longboat Key Property Is Not Statutorily Subject To Forfeiture

Under 18 U.S.C. §982(a), the government must show that the subject

property is sufficiently connected to the conviction. *Cherry*, 330 F.3d at 670; Fed.

R. Crim. P. 32.2(b)(1)(A). Section 982(a)(2)(A), the provision applicable here, has

a strict nexus requirement. Unlike a neighboring provision, which requires

showing merely that property is "involved in" the offense or "traceable to"

property involved in the offense, 18 U.S.C. §982(a)(1), section 982(a)(2)(A)

authorizes only the forfeiture of property "constituting, or derived from, proceeds

the person obtained directly or indirectly, as the result of such violation," *id.*

§982(a)(2)(A).

Here, the district court—correctly following *United States v. Farkas*, 474

F.App'x 349 (4th Cir. 2012)—interpreted this language as creating a "but-for" test,

under which "funds are … forfeitable if 'a person would not have [the funds] *but*

*for* the criminal offense,'" *id.* at 360. In deeming that standard met, the court cited

the testimony of Ms. Mosby's underwriter that (in the court's words) Ms. Mosby

"was short on funds to close on the" home and "would not be able to" close

"without the gift letter." JA2520. And, the court asserted, there was "no

evidence" that Ms. Mosby could have obtained the mortgage (or another one)

without the gift letter. JA2521. Lastly, the court concluded that because the

mortgage covered 90% of the home's purchase price, 90% of the home's appreciated value was forfeitable.  JA2521.

This analysis was infirm.  The misrepresentation that the jury found in the gift letter may have *facilitated* obtaining the mortgage for the Longboat Key home, at least at a particular point in time; her underwriter testified that the purpose of the gift letter was to "make sure" that Ms. Mosby had "adequate funds to close" as scheduled.  JA1316.  But the government did not prove that but for the letter, Ms. Mosby *could not* have obtained the same funds (whether with the same mortgage or another) to buy the home.  The letter filled a temporary shortfall in Ms. Mosby's liquid assets, assuring the lender she could be "cleared to close" on schedule, JA1314-1315; JA1317.  It does not follow that the mortgage would necessarily have fallen through entirely had she waited two days to receive her regularly scheduled paycheck (*see supra* pp.15-16, 36) and shown that at that point she had the necessary funds.  Indeed, that narrative is entirely implausible given the lender's financial incentive to have the transaction succeed.  Nor does the record suggest that this particular loan uniquely enabled Ms. Mosby to purchase the Longboat Key home, e.g., because it offered a particularly low interest rate or other unusually favorable terms.  The underwriter could not even testify as to when the rate offered to Ms. Mosby would have expired, JA1317, i.e., whether a few days' delay in closing would have affected that core mortgage term.

At the forfeiture hearing, prosecutors argued that this argument constitutes "conjecture or speculation" as to whether Ms. Mosby "might have gone out and obtained another mortgage." JA2491. Not so; the evidence *establishes* that just two days after the scheduled closing date, Ms. Mosby received from a lawful source (her own paycheck) the same $5,000 the gift letter promised. *See supra* p.36. She unquestionably could have used those funds to close on the mortgage and buy the house without the need for any gift from her husband. Indeed, she testified that she transferred $5,000 from that paycheck to her husband before closing, JA2082, showing that she could afford to set those funds aside. The government in fact used this testimony to argue that Ms. Mosby had in fact contributed that $5,000 towards closing (i.e., paid for the funds promised by her then-husband herself), on the theory that Nick Mosby wired the funds she sent him (rather than his own $5,000) to the lender. JA2405-2406. On the government's own theory, therefore, no counterfactual inquiry is necessary—Ms. Mosby did in fact pay for the mortgage all on her own.

Put simply, the gift letter was not the but-for cause of Ms. Mosby obtaining the mortgage. It at most allowed her to close on the originally scheduled date, rather than a few days or weeks later. That does not satisfy the forfeiture statute's nexus requirement.

**B.    The Forfeiture Is An Unconstitutional Excessive Fine**

Ms. Mosby's home was valued at approximately $912,000 in June 2024,

meaning its forfeiture would impose on her a loss of $773,200 after offsetting the

sale proceeds she would receive.  JA357 n.*.  Even if statutorily authorized, that

forfeiture violates the Eighth Amendment's Excessive Fines Clause because "it is

grossly disproportional to the gravity of [the charged] offense," *Bajakajian*, 524

U.S. at 334.

Whether a forfeiture is grossly disproportional depends on four factors:

"(1) the amount of the forfeiture and its relationship to the authorized penalty;

(2) the nature and extent of the criminal activity; (3) the relationship between the

charged crime and other crimes; and (4) the harm caused by the charged crime."

*United States v. Sanders*, 107 F.4th 223, 232 (4th Cir. 2024).  Applying those

factors here demonstrates that the forfeiture is unconstitutionally excessive.

a.    Starting with the fourth factor, the district court found that Ms.

Mosby's lender (as the government conceded) was not harmed by the gift letter,

because her loan was "adequately secured by collateral."  JA2522; JA327.  That

finding was correct:  There was no evidence that Ms. Mosby was unable to meet

her monthly mortgage payments.  Indeed, she was making timely payments even

after sentencing.  JA361.

The district court did posit some intangible harm to the public, based on Ms. Mosby's status as a public official at the time. JA2522. But even putting aside that the conviction was unrelated to Ms. Mosby's public office, the harm the court posited is just the type of abstract, diffuse injury *Bajakajian* held insufficient to justify a large forfeiture, 524 U.S. at 339. As there, the "[f]ailure to report" that the jury here found actually "affected only one party"—the lender—"and in a relatively minor way." *Id.* "There was no fraud on the United States," and "no loss to the public fisc." *Id.* Nor (unlike in many forfeiture cases) did the conduct the jury found "put at risk the funds of" anyone else's account, *United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000), or deprive anyone of "their life savings" (or, again, anything at all), *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021). It involved one private mortgage, as to which the counterparty, again, was not harmed.

Under similar circumstances, the Ninth Circuit held—relying primarily on the lack of harm to anyone—that a violation of the same mortgage-fraud statute at issue here could not justify a civil forfeiture of a home to the extent of $200,686, far less than the amount of the forfeiture here. *United States v. 3814 NW Thurman Street*, 164 F.3d 1191, 1195, 1197 (9th Cir. 1999) (subsequent history omitted). The defendant there had allegedly told the lender that her income was ten times greater than it really was and had not disclosed that she was over $100,000 in debt.

- 54 -

*Id.* at 1194. Applying *Bajakajian*, the court held the forfeiture unconstitutional because the conduct was "at the low end of the severity spectrum" and caused no harm: "[N]either creditors nor the government suffered any actual loss," and the bank's lien on the property meant that it would be "fully reimbursed before any amount is forfeited." *Id.* at 1198. The forfeiture would thus bear "no reasonable correlation to any injury suffered by the government or any other party." *Id.* All that is equally true here.

      b.    As to the nature and extent of the criminal activity, the misrepresentation the jury found (regarding $5,000 that Ms. Mosby either had or would have days after the date the gift letter stated) was far less serious than most federal offenses. Yet the forfeiture of her home would impose a penalty twice the $350,000 forfeiture imposed for a prostitution-related offense in *United States v. Jalaram, Inc.*, 599 F.3d 347, 356 (4th Cir. 2010), and over five times the $136,601.03 forfeiture approved for a robbery in *United States v. Blackman*, 746 F.3d 137, 145 (4th Cir. 2014). In fact, even before accounting for the home's intangible value to Ms. Mosby, *see* JA2074, the loss of $773,200 would be a fine *154 times* the $5,000 value of the gift letter, s*ee* JA357 & n.*. In this respect, the case is similar to *Bajakajian*, which held that forfeiting $357,144 for "solely a reporting offense" (transporting over $10,000 in cash overseas without declaring it) would be "grossly disproportional to" its gravity. 524 U.S. at 337. Likewise here,

forfeiture of the home would be grossly disproportional to the offense of conviction, and not remotely be commensurate with any actual benefit that Ms. Mosby received from the gift letter.

In fact, that actual benefit is near zero. The gift letter did not make Ms. Mosby any money; as explained, it at most allowed her to close on a mortgage earlier than if she had waited for her next paycheck. A forfeiture is grossly disproportional when untethered to any benefit the defendant obtained—even when, for example, the defendant (unlike here) is a high-ranking official who "personally participated in transferring the funds that were the subject of her money laundering convictions," *United States v. Van Brocklin*, 115 F.3d 587, 601-602 (8th Cir. 1997), or where the defendant (again unlike here) engaged in illegal activity in the house the government seeks to forfeit, *United States v. One Single Family Residence Located at 18755 North Bay Road*, 13 F.3d 1493, 1498 (11th Cir. 1994).

The district court's two-sentence analysis of this factor does not refute any of the foregoing. The court simply stated that the conviction was "serious" because it involved "knowingly false statements by … a licensed attorney, while holding public office." JA2522. But the court itself had found that Ms. Mosby did *not* take advantage of her position as a public official. JA2669. She did not use public funds or campaign donations in connection with the gift letter. The

conviction was for a false statement in connection with purchasing a private home. That, again, is far less serious than many offenses that have involved lesser forfeitures.

c.      Regarding the relationship between the charged crime and others, the district court said there was evidence presented during the perjury trial that Ms. Mosby "obtained the funds to make her down payment by committing perjury in connection with her Coronavirus-related withdrawals." JA2522. But even if the perjury convictions were relevant connected convictions, they are not of the type or scale that courts have held make other offenses relevant under the factor. They were not, for example, part of a "systemic tax evasion," *Jalaram*, 599 F.3d at 356, or "a series of sophisticated commercial transactions over a period of years that were related to a customs fraud scheme," *Ahmad*, 213 F.3d at 817. Rather, as in *Bajakajian*, the money that Ms. Mosby was found to have misreported as a gift from her husband "was the proceeds of legal activity," 524 U.S. at 338. It came from her earned income and was not the proceeds of some illicit activity.

d.      The final factor is the amount of the forfeiture and its relationship to the authorized penalty. The amount of the forfeiture here is large: $773,200. JA357 n.*. That is an objectively substantial forfeiture.

The district court reasoned, however, that this factor favored forfeiture because the statutory *maximum* fine is $1 million. JA2522; *see* 18 U.S.C. §1014.

But as noted, this factor has two components: (1) the amount (standing alone) and (2) its relationship to the maximum authorized penalty. The first component weighs in favor of excessiveness given the objectively high forfeiture amount. And as to the second component, sister circuits have cautioned against "abstract" comparisons of forfeiture amounts and maximum authorized penalty—even where the latter is $1 million and the forfeiture is only $124,000 (far less than here). *von Hofe v. United States*, 492 F.3d 175, 189 (2d Cir. 2007). Rather, it is "critical" to "review the specific actions of the violator." *Pimentel v. City of Los Angeles*, 974 F.3d 917, 923 (9th Cir. 2020). Here, as explained, the conduct underlying the conviction (a misrepresentation about the source of a $5,000 contribution to a down payment) was far less serious than many offenses, and caused no harm. For it to cost Ms. Mosby $700,000 would be grossly excessive.

e.    Finally, while this Court has never "expressly considered a defendant's means in evaluating the proportionality of a forfeiture," it has acknowledged that means may be "one factor to be weighed." *Bennett*, 986 F.3d at 400. That factor deserves special weight here. The Magna Carta—to which the Excessive Fines Clause "traces its venerable lineage"—required that fines "not be so large as to deprive [an offender] of his livelihood." *Timbs v. Indiana*, 586 U.S. 146, 151 (2019). And the Longboat Key home now plays "a significant role in the maintenance of [Ms. Mosby's] livelihood," *One 1995 Toyota Pick-Up Truck v.*

*District of Columbia*, 718 A.2d 558, 566 (D.C. 1998), given that the rental revenue from it is one of her few remaining sources of income, JA307. She is so deep in debt in fact, that, as the district court recognized, she "cannot afford to pay a fine." JA2677. This financial predicament confirms that the forfeiture of Ms. Mosby's home, at a cost to her of over $700,000, would be grossly disproportional to the gravity of the one false statement that the jury found she made.

## CONCLUSION

The judgment should be reversed and the forfeiture order vacated.

August 19, 2024

Respectfully submitted,

/s/ Daniel S. Volchok

| | |
|---|---|
| JAMES WYDA | DANIEL S. VOLCHOK |
| MAGGIE GRACE | CARRIE M. MONTGOMERY |
| OFFICE OF THE FEDERAL | NITISHA BARONIA |
|     PUBLIC DEFENDER | WILMER CUTLER PICKERING |
| 100 S. Charles Street |     HALE AND DORR LLP |
| Tower II, 9th Floor | 2100 Pennsylvania Avenue N.W. |
| Baltimore, Maryland 21201 | Washington, D.C. 20037 |
| (410) 962-3962 | (202) 663-6000 |
| | daniel.volchok@wilmerhale.com |
| PARESH S. PATEL | |
| CULLEN O. MACBETH | ALAN SCHOENFELD |
| OFFICE OF THE FEDERAL | CHARLES C. BRIDGE |
|     PUBLIC DEFENDER | WILMER CUTLER PICKERING |
| 6411 Ivy Lane, Suite 710 |     HALE AND DORR LLP |
| Greenbelt, Maryland 20770 | 7 World Trade Center |
| (301) 344-0600 | 250 Greenwich Street |
| | New York, N.Y. 10007 |
| | (212) 230-8800 |

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Oral argument is warranted in light of the interlocking issues on appeal, the serious consequences that accompany a criminal conviction, and the substantiality of Ms. Mosby's claims. The Court's consideration will likely be aided by the presence of counsel to comment on the issues and respond to questions.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B)(i) in that, according to the word-count feature of

the word-processing system used to prepare this document (Microsoft Word for

Microsoft 365), the brief contains 12,999 words, excluding the portions exempted

by Rule 32(f).

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK

**CERTIFICATE OF SERVICE**

On this 19th day of August, 2024, I electronically filed the foregoing using

the Court's appellate CM/ECF system.  Counsel for all parties to the case are

registered CM/ECF users and will be served by that system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK