No. 24-4304

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARILYN J. MOSBY,

Defendant – Appellant.

On Appeal from the United States District Court
for the District of Maryland, Southern Division,
The Honorable Lydia Kay Griggsby, District Judge.

APPELLEE'S RESPONSE BRIEF

Erek L. Barron
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

TABLE OF CONTENTS

Table of Authorities ...................................................................................v

Jurisdictional Statement ............................................................................1

Statement of the Issues on Appeal ...........................................................2

Statement of the Case ...............................................................................3

      A.    Mosby's Underlying Criminal Conduct................................3

      B.    Relevant Procedural History ................................................4

Summary of the Argument.........................................................................6

Argument....................................................................................................7

  I.    The jury's venue determination in the mortgage-fraud trial is supported by a preponderance of the evidence.................................................7

      A.    Issues ...........................................................................7

      B.    Standard of Review ........................................................7

      C.    Analysis ..........................................................................8

  II.    The district court correctly instructed the jury in the mortgage-fraud trial on venue..................................................................24

      A.    Issues .........................................................................24

      B.    Standard of Review ......................................................24

      C.    Analysis ........................................................................24

  III.    The district court properly found that Mosby opened the door to questions about her perjury convictions .................................................33

A.    Issues ....................................................................33

B.    Standard of Review .............................................33

C.    Background ..........................................................34

D.    Analysis ...............................................................37

IV.   The district court correctly denied Mosby's untimely pretrial motion to dismiss the perjury counts ……………………….…………………………...46

A.    Issues ....................................................................46

B.    Standard of Review .............................................46

C.    Analysis ...............................................................48

V.    The district court properly denied Mosby's motion in limine to exclude evidence of how she used the money she acquired by means of her perjury………………………………………….......................................55

A.    Issue ......................................................................55

B.    Standard of Review .............................................55

C.    Analysis ...............................................................56

VI.   The district court properly determined that 90 percent of Mosby's Longboat Key property should be forfeited because of her mortgage-fraud conviction…………………………………………………………...63

A.    Issue ......................................................................63

B.    Standard of Review .............................................63

C.    Background ..........................................................64

D.    Analysis ............................................................65

Conclusion ..............................................................75

Certificates of Compliance and Service……………………………………..76

## TABLE OF AUTHORITIES

### CASES

*AirFacts, Inc. v. De Amezaga*,
  909 F.3d 84 (4th Cir. 2018) ........................................................ 10, 11

*Belk, Inc. v. Meyer Corp.*,
  679 F.3d 146 (4th Cir. 2012) ............................................................. 12

*Benjamin v. Sparks*,
  986 F.3d 332 (4th Cir. 2021) ....................................................... 58, 60

*Blueford v. Arkansas*,
  566 U.S. 599 (2012) ......................................................................... 63

*Borden v. United States*,
  593 U.S. 420 (2021) ............................................................. 11–12, 15

*Carpenter v. United States*,
  585 U.S. 296 (2018) ................................................................... 17, 18

*Fields v. Fed. Bureau of Prisons*,
  109 F.4th 264 (4th Cir. 2024) ..................................................... 34, 39

*Gibbons v. Gibbs*,
  99 F.4th 211 (4th Cir. 2024) ..............................................................14

*Honeycutt v. United States*,
  581 U.S. 443 (2017) ......................................................................... 69

*In re Under Seal*,
  749 F.3d 276 (4th Cir. 2014) ............................................................ 60

*Johnson v. United States*,
  576 U.S. 591 (2015) ........................................................................... 6

*Kaley v. United States*,
  571 U.S. 320 (2014) ........................................................... 71, 71, 72

*Lighte*,
  782 F.2d ........................................................................................ 51

*Musacchio v. United States,*
    577 U.S. 237 (2016) ................................................................ 14, 15

*Nixon v. City & Cnty. of Denver,*
    784 F.3d 1364 (10th Cir. 2015) ....................................................... 54

*Ocasio v. United States,*
    578 U.S. 282 (2016) ....................................................................... 27

*Smith v. Massachusetts,*
    543 U.S. 462 (2005) ....................................................................... 12

*Smith v. United States,*
    599 U.S. 236 (2023) ...................................................... 12, 13, 28

*United States v. 3814 NW Thurman Street,*
    164 F.3d 1191 (9th Cir. 1999) ......................................................... 74

*United States v. Ahmad,*
    213 F.3d 805 (4th Cir. 2000) .................................................... 65, 66

*United States v. Angotti,*
    105 F.3d 539 (9th Cir. 1997) ........................................................... 28

*United States v. Barsanti,*
    943 F.2d 428 (4th Cir. 1991) ........................................................... 28

*United States v. Basham,*
    561 F.3d 302 (4th Cir. 2009) .................................................... 11, 40

*United States v. Benkahla,*
    530 F.3d 300 (4th Cir. 2008) ........................................................... 60

*United States v. Bennett,*
    986 F.3d 389 (4th Cir. 2021) ..................................................... 71-72

*United States v. Blackman,*
    746 F.3d 137 (4th Cir. 2014) ........................................................... 71

*United States v. Blake,*
    571 F.3d 331 (4th Cir. 2009) ........................................................... 41

*United States v. Blecker,*

657 F.2d 629 (4th Cir. 1981) ........................................ ……...13, 28, 29-30, 33

*United States v. Boskic*,
    545 F.3d 69 (1st Cir. 2008) ..................................................... 52

*United States v. Carriles*,
    541 F.3d 344 (5th Cir. 2008) .................................................. 52

*United States v. Cashin*,
    281 F.2d 669 (2d Cir. 1960) ................................................... 29

*United States v. Cole*,
    631 F.3d 146 (4th Cir. 2011) .............................................. 59, 62

*United States v. Corbett*,
    374 F. App'x 372 (4th Cir. 2010) (per curiam) ........................... 11, 8

*United States v. Council*,
    77 F.4th 240 (4th Cir. 2023) ............................................. 8, 34, 40

*United States v. Cowden*,
    882 F.3d 464 (4th Cir. 2018) .................................................. 26

*United States v. Crump*,
    65 F.4th 287 (6th Cir. 2023) .................................................. 60

*United States v. Curry*,
    977 F.2d 1042 (7th Cir. 1992) ................................................ 31

*United States v. Day*,
    700 F.3d 713 (4th Cir. 2012) .................................................. 54

*United States v. Doost*,
    3 F.4th 432 (D.C. Cir. 2021) .................................................. 56

*United States v. Duncan*,
    598 F.2d 839 (4th Cir. 1979) .................................................. 26

*United States v. Ebersole*,
    411 F.3d 517 (4th Cir. 2005) ............................................... 7, 29

*United States v. Ebert*,
    61 F.4th 394 (4th Cir. 2023) .............................................. 12, 44

vii

*United States v. Edwards*,
188 F.3d 230 (4th Cir. 1999) ................................................. 30-31

*United States v. Elsheikh*,
103 F.4th 1006 (4th Cir. 2024) (per curiam) ................................. 58

*United States v. Estrada*,
430 F.3d 606 (2d Cir. 2005) ................................................. 42

*United States v. Freitekh*,
114 F.4th 292 (4th Cir. 2024) ............................. 57, 61, 71, 74

*United States v. Galindo-Serrano*,
925 F.3d 40 (1st Cir. 2019) ................................................. 51

*United States v. Gallagher*,
90 F.4th 182 (4th Cir. 2024) ................................................. 12

*United States v. Garcia-Lagunas*,
835 F.3d 479 (4th Cir. 2016) ............................... 34, 39, 40

*United States v. Hager*,
721 F.3d 167 (4th Cir. 2013) ................................................. 25

*United States v. Hale*,
857 F.3d 158 (4th Cir. 2017) ............................................. 38-39

*United States v. Hart*,
91 F.4th 732 (4th Cir. 2024) ......................................... 57, 59

*United States v. Herder*,
594 F.3d 352 (4th Cir. 2010) ................................................. 65

*United States v. Horsley*,
105 F.4th 193 (4th Cir. 2024) ................................................. 31

*United States v. Hurwitz*,
459 F.3d 463 (4th Cir. 2006) ................................................. 26

*United States v. Idowu*,
443 F. App'x 885 (4th Cir. 2011) (per curiam) ......................... 27, 26

*United States v. Jalaram, Inc.*,

599 F.3d 347 (4th Cir. 2010) .................................................. 71, 71, 72, 75, 75

*United States v. Johnson*,
    732 F. App'x 638 (10th Cir. 2018) .................................................... 29

*United States v. Johnson*,
    956 F.3d 510 (8th Cir. 2020) .................................................. 20, 22, 22

*United States v. Kibler*,
    667 F.2d 452 (4th Cir. 1982) .......................................................... 29

*United States v. Kingrea*,
    573 F.3d 186 (4th Cir. 2009) .......................................................... 48

*United States v. Knott*,
    928 F.2d 97 (4th Cir. 1991) ........................................................... 30

*United States v. Lenihan*,
    No. 92-5812, 1994 WL 102149 (4th Cir. Mar. 29, 1994) (per curiam) ........... 12

*United States v. Martinez*,
    901 F.2d 374 (4th Cir. 1990) ..................................................... 14, 22

*United States v. Mathis*,
    932 F.3d 242 (4th Cir. 2019) .......................................................... 39

*United States v. McCabe*,
    103 F.4th 259 (4th Cir. 2024) .................................................... 25, 61

*United States v. McConnell*,
    792 F.3d 478 (4th Cir. 2015) ..................................................... 27, 26

*United States v. McLaurin*,
    764 F.3d 372 (4th Cir. 2014) ................................................ 34, 41, 42

*United States v. McLean*,
    695 F. App'x 681 (4th Cir. 2017) (per curiam) ................................... 12

*United States v. McNair*,
    605 F.3d 1152 (11th Cir. 2010) ...................................................... 73

*United States v. Melia*,
    741 F.2d 70 (4th Cir. 1984) (per curiam) .................................... 118, 11

*United States v. Monsanto,*
   491 U.S. 600 (1989) ........................................................... 76

*United States v. Moore,*
   11 F.3d 475 (4th Cir. 1993) .............................................. 63

*United States v. Moore,*
   769 F.3d 264 (4th Cir. 2014) ............................................ 51

*United States v. Ojedokun,*
   16 F.4th 1091 (4th Cir. 2021) ............................ 48-49, 49, 50, 51

*United States v. Parodi,*
   703 F.2d 768 (4th Cir. 1983) ............................................ 40

*United States v. Peters,*
   732 F.3d 93 (2d Cir. 2013) .............................................. 72

*United States v. Powers,*
   40 F.4th 129 (4th Cir. 2022) ............................................ 12

*United States v. Raza,*
   876 F.3d 604 (4th Cir. 2017) ............................................ 25

*United States v. Robertson,*
   68 F.4th 855 (4th Cir. 2023) .......................... 32, 46, 54, 57, 63

*United States v. Robinson,*
   8 F.3d 398 (7th Cir. 1993) ............................................ 42, 43

*United States v. Royer,*
   549 F.3d 886 (2d Cir. 2008) ............................................ 29

*United States v. Sabhnani,*
   599 F.3d 215 (2d Cir. 2010) ............................................ 27

*United States v. Sarwari,*
   669 F.3d 401 (4th Cir. 2012) ........................................ 51, 52, 54

*United States v. Smith,*
   29 F.3d 914 (4th Cir. 1994) ........................................... 29, 33

*United States v. Soriano-Jarquin,*

492 F.3d 495 (4th Cir. 2007) ................................................................. 51

*United States v. Sparks*,
   67 F.3d 1145 (4th Cir. 1995) .......................................................... 30

*United States v. Spirito*,
   36 F.4th 191 (4th Cir. 2022) .......................................................... 73, 72

*United States v. Sterling*,
   860 F.3d 233 (4th Cir. 2017) ................................... 7, 14, 23, 23, 31

*United States v. Stover*,
   499 F. App'x 267 (4th Cir. 2012) .................................................. 53

*United States v. Vinson*,
   852 F.3d 333 (4th Cir. 2017) .......................................................... 30

*United States v. Watkins*,
   111 F.4th 300 (4th Cir. 2024) .................................................. 11, 12

*United States v. White*,
   810 F.3d 212 (4th Cir. 2016) .......................................................... 32

*Williams v. United States*,
   458 U.S. 279 (1982) .................................................................. 29, 28

*Wood v. Milyard*,
   566 U.S. 463 (2012) ................................................................. 7-8, 10

## **STATUTES**

12 U.S.C. § 1441 ................................................................................... 29

18 U.S.C ............................................................................................... 28

18 U.S.C. § 982 ............................................................... 65, 67, 74, 76

18 U.S.C. § 1014 ................................................. 3, 13, 24, 71, 73

18 U.S.C. § 1344 ................................................................................... 69

18 U.S.C. § 1621 ..................................................................................... 3

18 U.S.C. § 3231 ..................................................................................... 1

21 U.S.C. § 853 ................................................................................... 74

28 U.S.C. § 1291 ..................................................................................... 1

§ 853 ............................................................................... 74

§ 982 ............................................................................... 69

§ 1014 .............................................................. 28, 29, 28, 33

§ 3.09 (2024) ................................................................... 27

§ 6.32 (2024) ................................................................... 27

## **RULES**

Fed. R. App. P. 32 ......................................................... 78

Fed. R. Crim. P. 12 ............................................. 48, 49, 50

Fed. R. Crim. P. 30 ......................................................... 25

Federal Rule of Criminal Procedure 29 ........................... 12

Federal Rules of Evidence 401 ............................. 4, 57, 58

Rule 12 ............................................... 49, 50, 51, 56

Rule 29 ......................................................................... 12

Rule 30 ............................................................... 27, 25

Rule 401 ....................................................................... 57

Rule 401 and 403 ....................................................... 58

Rule 403 ................................................... 46, 57, 61

## **OTHER AUTHORITIES**

USSG § 2A1.1 ................................................................... 5

USSG § 5E1.2 ....................................................... 71, 74

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of defendant-appellant Marilyn J. Mosby's federal offenses. 18 U.S.C. § 3231. On May 23, 2024, the court entered a judgment of conviction against her. JA334-340.[1] On June 6, 2024, Mosby timely filed a notice of appeal from that final judgment. JA341. This Court has jurisdiction of her appeal. 28 U.S.C. § 1291.

---

[1] Citations of "JA" refer to the Joint Appendix; "AB," the Appellant's Brief; and "ECF No.," an electronic case filing in the district court docket below.

1

STATEMENT OF THE ISSUES ON APPEAL

I.     **Whether Mosby preserved her challenge to the jury's venue finding in her mortgage-fraud trial and, if she has, whether the evidence supports that finding.**

II.    **Whether Mosby preserved her challenge to the district court's venue instruction in her mortgage-fraud trial and, if she has, whether it correctly stated the law.**

III.   **Whether Mosby preserved her challenge to the district court's ruling that she opened the door to cross-examination about her prior perjury conviction and, if she has, whether the court abused its discretion.**

IV.    **Whether Mosby preserved her pretrial challenge to her perjury counts and, if she has, whether the certifications underlying those counts were fundamentally ambiguous.**

V.     **Whether the district court properly denied Mosby's motion *in limine* to exclude from her perjury trial any evidence of how she used the funds she obtained by means of her perjury.**

VI.    **Whether the district court properly determined that the Longboat Key property is subject to forfeiture.**

2

## STATEMENT OF THE CASE

### A.    Mosby's Underlying Criminal Conduct

From January 2015 to January 2023, Mosby served in elected public office as the Baltimore City State's Attorney. JA1380. She earned a "significant salary" as Baltimore's chief prosecutor and was "the highest paid elected official in the state of Maryland." JA2049. In 2020, she earned about $9,200 every two weeks, and her gross annual pay was $247,955.58—more than the $238,772.04 she made in 2019. JA442, JA492-493.

Mosby nonetheless owed significant back taxes on her joint federal tax returns with her then-husband Nick Mosby, another Baltimore politician who "literally ran [her] campaign" for public office. JA1486. In 2014, for example, the Mosbys had an adjusted gross income of $359,833, a total tax of $82,590, and withholdings of only $28,852, leaving them with an outstanding tax bill of $46,556. JA1072-1075. They also filed their tax return in September 2015. JA1076-1077. The Internal Revenue Service penalized them for not prepaying their taxes and paying the taxes late and assessed them interest for their late (partial) payment. JA1076. The IRS also mailed notices—more than 40 over the years—to their Baltimore residence, reminding them of their outstanding tax debt. JA1123. In a March 2020 notice sent individually to both Mosbys by certified mail, the IRS warned them that a federal tax lien had been

filed against them for their outstanding $45,000 tax debt from 2014, 2015, and 2016. JA1109-1111, JA1115-1116.

In 2020, while "stuck at home" in Baltimore during COVID, Mosby decided to invest in real estate. JA2060-2061. She placed offers on some homes in Baltimore, but they "all fell through." JA2061. So she reached out to a Florida realtor, Monique Holston-Greene. JA2061. Mosby wanted "a second home, vacation rental," that she could "rent [out] so that it could . . . pay for itself." JA2063-2064. She "put a contract in on" one home, but it "fell through." JA2064. So the search continued. *Id.*

In April 2020, the City of Baltimore—pursuant to a federal statute called the CARES Act—allowed City employees to take early distributions from their 457(b) retirement accounts as a means of providing relief to people "suffering through the pandemic." JA446-448. The following month, Mosby requested a $40,000 COVID-related distribution from her 457(b) account, JA2736-2738, making her one of three people in the Baltimore City State's Attorney's Office to do so, JA483. To show that she was eligible for this distribution, Mosby certified under penalty of perjury that she had "experienced adverse financial consequences stemming from [COVID-19] as a result of: [1] Being quarantined, furloughed or laid off; [2] Having reduced work hours; [3] Being unable to work due to lack of child care; [and/or 4] The closing or reduction of hours of a business I own or operate." JA2738.

4

But that certification was false. As Baltimore City State's Attorney, Mosby was not furloughed or laid off, kept working full-time, did not experience any change in pay or reduction in work hours, and in fact made more in 2020 than 2019. JA442-443. Although she had plans for a travel business called Mahogany Elite, it did not have any clients or revenue—indeed, it had not yet opened its doors—because she had no plans to operate it while serving as State's Attorney. JA561, JA618-620, JA630-632.

By July 2020, Mosby found online a property in Kissimmee, Florida, that she bought without visiting. JA2065, JA2069; Gov. Ex. 1 at 6. In September 2020, she closed on the property, buying it for $545,000 and taking out a $490,500 mortgage at 2.990%. Gov. Ex. 1(b) at 3-4. In applying for that mortgage, she did not disclose her federal tax debt when listing her "Liabilities," and she declared that she was not "delinquent or in default on any Federal debt." *Id.* at 2-4. She also signed a "second home rider" stating that she would not "give [a] management firm . . . control over the occupancy or use of the property." JA1230. But one week before she signed the rider, JA1231, she signed a contract with a management firm giving it control over who could rent and stay in the Kissimmee home, JA1172-1174.

Mosby used the $40,000 COVID-related distribution she requested in May to pay for the downpayment on the Kissimmee home. JA2113.

5

In late December 2020, Mosby requested a second and final COVID-related distribution from her 457(b) account, but now for $50,000. JA2739-2741. She once again falsely certified under penalty of perjury that she had "experienced adverse financial consequences stemming from [COVID-19] as a result of [any of the four enumerated events]." JA2741.[2]

In early January 2021, Mosby jumped on a property in Longboat Key, Florida, contracting to purchase it only three days after it was listed. Gov. Ex. 2 at 61. The contract gave her until February 19, 2021, to close on the property on pain of default. *Id.* at 790. If she defaulted, the seller could terminate the contract. *Id.* at 791.

In her mortgage application, Mosby yet again did not disclose her federal tax debt when listing her "Liabilities," and she once again declared that she was not "delinquent or in default on any Federal debt." Gov. Ex. 2(c) at 3-5.

Although her mortgage for the Kissimmee house had a 2.990% interest rate, Gov. Ex. 1 at 8, Mosby locked in an even better rate of 2.875% on her mortgage for the Longboat Key house—but it expired on February 19, 2021. Gov. Ex. 2 at 104, 576. So she needed to close on the mortgage by then to secure that rate. JA1315. But

---

[2]  In her perjury trial, Mosby's defense was that she had experienced "adverse financial consequences" stemming from COVID-19 as a result of the "closing or reduction of hours of a business I own or operate," *see* JA2738, JA2741, because she had paid about $450 in filing and website fees for Mahogany Elite and COVID-19 "halted global travel." JA846.

in early February, she learned that she needed another $5,000 in assets to close. *See* JA1846. That put her mortgage rate at risk because if she "didn't close then that rate lock was set to expire." JA1315. She told her mortgage broker, Gilbert Bennett, that she would be getting a new paycheck on February 12, *see* JA1846, JA2371, but he still provided her with the gift letter template, telling her that it would get her clear to close by the next day. JA1847-1848. So she executed a gift letter, JA1317, falsely stating that she had received a gift of $5,000 from her then-husband, JA2747. Her statement was false because after she submitted the gift letter, she provided her then-husband with the $5,000 that he later "gifted" to her. JA1366-1370.

On February 9, 2021, Mosby received from Bennett the template for the gift letter. JA1365; Gov. Ex. 53(c). The template already had some information filled in, including who the gift was for (to "Marilyn Mosby" from her "Husband"), what the gift was for ("purchase of the property" in "Long Boat Key"), and the gift amount ("$5,000 to be transferred AT CLOSING"). Gov. Ex. 53(d). It did not contain her husband's information, the bank account information for the "source of funds for this gift," or the Mosbys' signatures. *Id.* Bennett told Mosby that the gift funds "ha[d] to come from th[e] account" mentioned in the gift letter and that once she provided the account information, they could "get this [mortgage] Clear to Close tomorrow." Gov. Ex. 53(c). After filling out the template, the Mosbys both signed it; Nick Mosby

dated his signature February 9, 2021, and Mosby dated hers February 10, 2021. Gov.

Ex. 2(l). The mortgage lender received the letter on "the 9th or the 10th," JA1316.

By February 10, the lender's files reflected the $5,000 gift, Gov. Ex. 2 at 104, 878,

882, and Mosby's mortgage was approved to close, Gov. Ex. 2 at 104-105.

Mosby signed the mortgage for the Longboat Key property on February 19,

2021, Gov. Ex. 2 at 857, the last day she could close at the locked-in rate, *id.* at 576,

and without risking default under the sales contract, *id.* at 790. She purchased the

property for $476,000 and took out a $428,400 mortgage to pay for it. Gov. Ex. 2(c).

She used the $50,000 COVID-related distribution she requested in December 2020

to pay for the downpayment. JA2116.

## B.    Relevant Procedural History

In March 2022, a federal grand jury issued a superseding indictment charging

Mosby in four counts: Two counts of perjury, in violation of 18 U.S.C. § 1621, and

two counts of making a false statement to influence a mortgage lending business, in

violation of 18 U.S.C. § 1014. JA42-62.

In May 2022, the district court entered a scheduling order, setting a pretrial-

motions deadline of June 1, 2022. ECF No. 61. Mosby had filed two pretrial motions

months earlier. JA2. Before entering the order, the court told her that if she wanted

to file additional pretrial motions, she needed to "seek leave to file" them and show

8

"good cause." ECF No. 276 at 21-22. Mosby was the one who requested the June 1 deadline. *Id.* at 24.

On June 16, 2022, more than two weeks after that deadline, Mosby filed an untimely motion to dismiss the perjury counts "for failing to state an offense." JA63-84. She argued, as relevant, that she could not be charged with perjury for certifying that she had experienced "adverse financial consequences" stemming from COVID-19 as a result of the four enumerated events. JA74-80. She said that the term "adverse financial consequences" is "fundamentally ambiguous"—but did not argue "good cause" for her motion's untimeliness. *Id.* In opposing the motion, the government argued that it was "untimely" and "meritless." ECF No. 72 at 1. The court denied it on the merits. JA165-167.

Mosby filed a motion *in limine* to preclude evidence that she used the money she obtained by means of her perjury to pay the downpayments on her two Florida vacation homes. JA108-114. She said that the evidence is inadmissible under Federal Rules of Evidence 401 and 403. *Id.* The court denied the motion. JA156-157.

The court granted Mosby's motions "to transfer venue" for trial to the District of Maryland's Southern Division and "for severance" of the perjury counts from the mortgage-fraud counts. JA176-184. As for the latter, the court explained that it was severing the counts because "a joint trial would encumber [Mosby's] decision about

9

whether to assert her Fifth Amendment privilege." JA183. By granting severance, the court ruled, she could now testify in one trial but not the other. JA183.

In October 2023, Mosby proceeded to trial on the perjury counts. JA23. The jury convicted her of both counts. JA187.

In January 2024, Mosby proceed to trial on the mortgage-fraud counts. JA30. Of the seven charged false statements in the mortgage applications for the Longboat Key and Kissimmee properties, the jury convicted Mosby of only the false statement in the gift letter in the Longboat Key application. JA290-291. The government then moved for the forfeiture of the Longboat Key home. JA2885-2892. Over Mosby's objection, JA305-322, the court ordered her to forfeit 90% of the property, which is the amount she purchased with the fraudulently obtained mortgage. JA330-333.

The court sentenced Mosby to time served, to be followed by three years of supervised release. JA336-337.

This timely appeal follows. JA341.

## SUMMARY OF THE ARGUMENT

Mosby has waived her challenge to the jury's venue finding in her mortgage-fraud trial because she withdrew that challenge at the post-trial hearing on venue. At that hearing, she directed the district court to decide instead whether the government had proven venue in our case-in-chief. But the jury's venue finding, which was based on all the evidence at trial, cannot be attacked on appeal based on the sufficiency of only a fraction of the evidence. In any event, her challenge fails on the merits because there is ample evidence that Mosby lived, worked, and spent all her time in Maryland in early February 2021 when she made the false statement underlying her mortgage-fraud conviction (i.e., the false statement in the February 10 gift letter).

Mosby has also waived her challenge to the court's venue instruction in her mortgage-fraud trial because she did not object to that instruction at all on the day it was given. On the merits, the court correctly instructed the jury on venue, using the model instruction. In any event, any error was harmless.

Mosby waived, too, her challenge to the court's decision that she opened the door to cross-examination about her prior perjury convictions. Instead of objecting to the court's decision, she agreed that she made a "limited intrusion" that opened the door to a government "response." She then agreed to the questions she could be asked about her perjury convictions on cross-examination. In any event, the court

11

did not abuse its discretion in determining that she—as everyone agreed—opened the door and that the resulting unobjected-to cross-examination was reasonable.

Mosby waived as well her pretrial challenge to her perjury counts because her motion to dismiss them under Rule 12(b)(3) was untimely, and she has not argued "good cause" to excuse its untimeliness. On the merits, the court correctly held that the certifications underlying those counts were not fundamentally ambiguous.

Mosby has preserved only her final claims of error. But they still fail. The court properly determined that evidence of how she used the funds she obtained by means of her perjury was admissible at her trial for perjury. The court also properly determined that the Longboat Key property is subject to forfeiture because of her mortgage-fraud conviction, and forfeiting those proceeds of her crime does not violate the constitution.

In sum, this Court should affirm Mosby's judgment of conviction.

12

<div align="center">

**ARGUMENT**

</div>

**I.    The jury's venue determination in the mortgage-fraud trial is supported by a preponderance of the evidence.**

**<u>Issues:</u>**

Despite challenging the sufficiency of the evidence of venue in her mortgage-fraud trial at the close of the government's case-in-chief, her defense case, and the government's rebuttal case, Mosby told the district court at the post-trial hearing on her challenge that it was "frozen in time on the case in chief." JA2714. Accepting that premise, the court denied her challenge on the ground that the government's "case-in-chief" sufficiently proved venue. JA303, JA2725. The issues on appeal are whether Mosby waived her venue challenge by abandoning any challenge to the sufficiency of all the evidence and, if she did not, whether the jury's venue finding is supported by a preponderance of the evidence. *See* AB 27-30.

**<u>Standard of Review:</u>**

This Court normally "review[s] de novo whether there was sufficient evidence to support a jury's finding of venue." *United States v. Sterling*, 860 F.3d 233, 241 (4th Cir. 2017). But challenges to "venue may be waived by the defendant." *United States v. Ebersole*, 411 F.3d 517, 525 (4th Cir. 2005). Waiver can occur through the defendant's "intentional relinquishment or abandonment" of the challenge. *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (holding that a party waives a challenge when it

<div align="center">13</div>

has a "clear and accurate understanding" of it but then "refrain[s] from interposing" it and "deliberately steer[s] the District Court away from [it]"); *see also United States v. Council*, 77 F.4th 240, 256 (4th Cir. 2023) ("A party who identifies an issue, and then explicitly withdraws it, has waived the issue."). "[W]hen a claim is waived, it is not reviewable on appeal, even for plain error." *Council*, 77 F.4th at 256.

**<u>Analysis:</u>**

As an initial matter, Mosby waived her venue challenge by telling the district court—in clear and unambiguous terms—that her challenge to the sufficiency of the evidence of venue was "frozen in time on the case-in-chief." JA2714. She knew that if she wanted to preserve this challenge, she needed to raise it "at the close of all the evidence." *United States v. Melia*, 741 F.2d 70, 71 (4th Cir. 1984) (per curiam); *see also United States v. Corbett*, 374 F. App'x 372, 376 (4th Cir. 2010) (unpublished) (per curiam) (stating that "challenges to venue" are "waived if not raised . . . at the close of all the evidence"). So she dutifully raised it at the close of evidence in each case: (1) the government's case in chief, JA216-220; (2) her defense case, JA2223; and (3) our rebuttal case, JA2246. She therefore knew that with new evidence came the need to make a new objection.

Despite objecting to the sufficiency of the evidence of venue after her defense case and the government's rebuttal case, she explicitly withdrew these objections at

14

the post-trial hearing on her venue challenge. When the government argued that her defense case helped prove that venue was proper, she objected that the government was "blurring the line about some of the evidence the [c]ourt can consider" because, she asserted, her venue challenge was "frozen in time on the [government's] case-in-chief." JA2713-2714. She said that "the [c]ourt shouldn't engage in the blurring of that line" and should limit its review of the record to "the Government's case-in-chief." JA2714. In response, the government focused its argument on the evidence in its "case-in-chief." JA2716. And the court said that it would "rely upon" only the evidence in "the Government's case-in-chief" in ruling on her challenge. JA2717. The court denied her challenge on the ground that the government had "put forth sufficient evidence in its case-in-chief" to prove venue. JA2724; *see also* JA303. By "deliberately steer[ing] the [court] away from" her all-the-evidence challenge and urging it to focus instead on her case-in-chief challenge, Mosby waived her challenge to whether the complete trial record supports the jury's venue finding. *Wood*, 566 U.S. at 474.

Although it is clear from her objections and arguments at the post-trial hearing that Mosby abandoned any challenge to the sufficiency of all the evidence of venue, her post-hearing conduct further shows that she waived the challenge. *See AirFacts, Inc. v. De Amezaga*, 909 F.3d 84, 92 (4th Cir. 2018). Mosby does not "advance the

15

claim on appeal" that the complete trial record was insufficient to support the jury's

venue finding. *Id.* Instead, she merely renews the "argument" that the district court

rejected at "JA301-303," AB 27, which challenged whether "the Government

sufficiently established [venue] during its case-in-chief," JA303. What is more, on

appeal she ignores the evidence of venue presented after the government's case-in-

chief. For example, she asserts that there is no "evidentiary hook" to suggest that she

and Nick Mosby were in the same place, let alone in the same district, when she

made the false statement in "the gift letter." AB 29-30. But that ignores his testimony

in her defense case that they "were in bed" together when her mortgage broker called

to say that she "needed a gift letter." JA1549-1550. Next, Mosby does not "argue

that the district court erred in not addressing" her challenge to the sufficiency of all

the evidence. *AirFacts, Inc.*, 909 F.3d at 92. That, too, shows that she "did not intend

to pursue the claim." *Id.* Indeed, after the court reserved decision on her all-the-

evidence challenge, she did not later ask it to resolve that challenge. "By failing to

request" that the court "rule on" her all-the-evidence challenge, she "waived" it yet

again.[3] *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009). So although she

objected to the sufficiency of the evidence of venue "at the close of all the evidence,"

---

[3] There is nothing unusual about requiring Mosby to ask the district court to
resolve her all-the-evidence challenge after it had denied her case-in-chief challenge.
*See United States v. Watkins*, 111 F.4th 300, 307 (4th Cir. 2024).

*Melia*, 741 F.2d at 71, she later waived that challenge on multiple grounds. And that was the only challenge that could preserve this issue for appeal. *See Melia*, 741 F.2d at 71; *Corbett*, 374 F. App'x at 376.

Although it is Mosby's "burden to establish" that she "preserved" her venue challenge, *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 153 n.6 (4th Cir. 2012), she does not argue preservation in her opening brief, *see* AB 22-30, waiving any argument she might have made, *United States v. Ebert*, 61 F.4th 394, 402 (4th Cir. 2023). In any event, Mosby cannot challenge the jury's venue finding—which was based on all "the evidence developed at trial," JA2432—on the ground that the government's case in chief does not support that all-the-evidence finding. Normally, "a reviewing court considering a sufficiency challenge must consider 'all the evidence considered by the jury,'" *United States v. Gallagher*, 90 F.4th 182, 189 (4th Cir. 2024), not just the fraction set forth in the government's case in chief. Indeed, the general rule is that a defendant "waives his objections" to the sufficiency of the evidence in the case in chief "[b]y introducing evidence" of his own.[4] *Watkins*, 111 F.4th at 307.

---

[4] Mosby cannot take shelter in Federal Rule of Criminal Procedure 29(b), which authorizes a district court to "reserve decision" on a Rule 29(a) motion and "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). That is because a venue challenge is not a Rule 29 challenge. A "Rule 29 judgment of acquittal is a substantive determination that the prosecution has failed to carry its burden" with respect to the "elements of the offense." *Smith v. Massachusetts*, 543 U.S. 462, 468 (2005). Venue, however, "is not an element of the

On the merits, Mosby's claim of error fails. A trial "may be held 'where any part' of a crime 'can be proved to have been done.'" *Smith v. United States*, 599 U.S. 236, 244 (2023). The jury convicted Mosby of violating 18 U.S.C. § 1014 based on the false statement she made in the February 2021 gift letter. JA291-293. Mosby concedes that venue was proper in the District of Maryland if she "transmitted the letter from Maryland." AB 27; *see also United States v. Blecker*, 657 F.2d 629, 633 (4th Cir. 1981) (holding that when a law punishes someone "who 'makes or presents' a false claim to any agency," venue is appropriate where the claim is "transmitted to" the agency or "submitted to an intermediary" to be transmitted). This Court "will uphold the jury's finding if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found venue by a preponderance of the evidence." *Sterling*, 860 F.3d at 241. Proof of venue may be "by circumstantial evidence alone." *United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990).

---

crime." *United States v. Powers*, 40 F.4th 129, 134 (4th Cir. 2022). That is why "a bare Rule 29 motion for acquittal that does not mention venue waives the venue argument." *United States v. McLean*, 695 F. App'x 681, 683 (4th Cir. 2017) (per curiam) (unpublished). Even when an order granting a venue challenge is "styled as a 'judgment of acquittal' under Rule 29," it "plainly does not resolve 'the bottom-line question of "criminal culpability."'" *Smith v. United States*, 599 U.S. 236, 253 (2023) (quoting *Evans v. Michigan*, 568 U.S. 313, 324 n.6 (2013)). Thus, Rule 29 does not apply to venue challenges. Even if it did, nothing in the Rule says that if the court *denies* a reserved motion for judgment of acquittal, the jury's all-the-evidence finding of venue can be overturned on appeal if the government's case in chief—only a fraction of the evidence—did not sufficiently prove venue.

18

The jury's venue determination—which was beyond "any reasonable doubt," JA2439, not merely a preponderance of the evidence—finds ample support in the government's case in chief. Indeed, the jury could infer from our case in chief that *everything* Mosby did in making the false statement in the gift letter occurred in the District of Maryland. What is more, there was no basis for the jury to infer that she did only some—as opposed to all—of her false-statement acts in Maryland.[5]

The government introduced Mosby's gift letter in our case in chief as Exhibit 2(l). *See* JA1287. On the evening of February 9, 2021, Mosby's mortgage broker, Gilbert Bennett, emailed her an unsigned "gift letter template" to fill out. JA1365; Gov. Ex. 53(c). The template already had some information filled in, including who the gift was for (to "Marilyn Mosby" from her "Husband"), what the gift was for ("purchase of the property" in "Long Boat Key"), and the gift amount ("$5,000 to be transferred AT CLOSING"). Gov. Ex. 53(d). It did not contain her husband's information, the bank account information for the "source of funds for this gift," or the Mosbys' signatures. *Id.* Bennett told Mosby that once she provided the account

---

[5] The parties agree that the jury had to find venue only by a "preponderance of the evidence." AB 27. The jury was nonetheless instructed to find venue beyond a reasonable doubt "to avoid confusion [caused] by interjecting a lower standard [of proof]" into the instructions, LEONARD B. SAND ET AL., 1-3 MODERN FEDERAL JURY INSTRUCTIONS—CRIMINAL, ¶ 3-11 (2024), which otherwise told the jury to find facts "beyond a reasonable doubt," *e.g.*, JA2438, JA2450-2451.

information, they could "get this [mortgage] Clear to Close tomorrow." Gov. Ex. 53(c). After filling out the template, the Mosbys signed the completed letter: Nick Mosby dated his signature February 9, 2021, and Mosby dated hers February 10, 2021. Gov. Ex. 2(l). The mortgage lender's underwriter, JA1313, said that the lender received the letter on "the 9th or the 10th," JA1316. By February 10, the lender's files reflected the $5,000 gift, Gov. Ex. 2 at 104, 878, 882, and Mosby's mortgage was approved to close, Gov. Ex. 2 at 104-105.

The jury could reasonably infer from that evidence that *everything* Mosby did with the gift letter—from receiving it in template form to transmitting it in completed form—occurred between the evening of February 9 (when Bennett sent her the gift letter template) to sometime the next day (when the mortgage lender's files reflected the $5,000 gift). Indeed, the district court held that the jury could infer that Mosby "submitted the False Gift Letter to [mortgage lender] United Wholesale Mortgage on February 10, 2021." JA301. Mosby does not challenge that decision and, in fact, agrees with it. *See* AB 27 (recognizing that the jury could find that "the gift letter was transmitted on . . . February 10, 2021"). She challenges only whether the jury could infer that "[she] transmitted the letter from Maryland." AB 27. It could.

The government's evidence showed that Mosby lived, worked, and spent most of her time in Maryland, including in early February 2021. Her residence was in

20

Baltimore, Maryland, and she had lived there for years. *See, e.g.*, JA1352-1354; Gov. Ex. 1(a) at 1; Gov. Ex. 2(c) at 1. Her job was in Baltimore, and she was in the middle of her second term in elected office as the Baltimore City State's Attorney. *See, e.g.*, JA1380; Gov. Ex. 2(c) at 2. And the record shows that she spent most of her time in Baltimore, as one would expect from a local official.

Consider, for example, Mosby's Bank of America account statements, which the government introduced in our case in chief as Exhibit 41(c). *See* JA1334. The statements cover December 15, 2020, to March 15, 2021, and list Mosby as the only person on the account. JA2748-2767. They record a series of check-card transactions during that three-month period, starting with a $10.74 charge at "Pure Raw Juice" at the Rotunda in Baltimore, MD, on December 17, 2020. JA2750. The jury could reasonably infer that because Mosby's check card was being used to make a purchase there at that time, she also was there at that time. *Cf. Carpenter v. United States*, 585 U.S. 296, 302 (2018) (inferring that Carpenter's cellphone's movements "catalogu[ed] Carpenter's movements").

Mosby's check-card usage easily shows by a preponderance of the evidence that she was in Maryland on February 9 and 10, 2021. As one would expect from

someone living and working (and quarantining) in Baltimore,[6] most of her check-card purchases from December 15, 2020, to February 15, 2021, took place in Maryland. *See* JA2750-2757. A reasonable jury could infer that she was in Maryland when making them. First, virtually all the purchases list the specific city in Maryland where Mosby made them, and they were all made in "Baltimore MD" with only one exception.[7] Next, all the purchases involved things that consumers tend to buy in person like groceries (Whole Foods, Giant), fast food (Pure Raw Juice, Boston Market), alcohol (Wells Discount Liquors), and drugstore items (Walgreens). *See id.* Thus, a reasonable jury could infer that Mosby was in Maryland when, for example, she bought groceries at a Whole Foods in "Baltimore" on February 4, 2021, and fast food at the Five Guys in "Cockeysville" on February 8, 2021.[8] *See* JA2757.

---

[6] The district court found that Mosby had acknowledged earlier that winter that she was "in quarantine with her family in Maryland" due to COVID-19. JA303 (citing Gov. Ex. 2(j)). Mosby does not challenge that finding on appeal.

[7] The exception was her $21.48 purchase at the Five Guys in "Cockeysville MD" on February 8, 2021. JA2757. The only Maryland-based purchases that did not take place in a specific city were her payments to Baltimore Gas and Electric, *see* JA2757, which nonetheless corroborated that she resided in Baltimore.

[8] The district court drew this inference in holding that the government's case in chief proved that Mosby "was in the District of Maryland when she submitted the False Gift Letter on February 10, 2021." JA302-303. Mosby does not dispute that the jury could reasonably infer that she was in Maryland based on the "[check-card] transactions on [her] account." JA302. Indeed, she concedes that those transactions establish that she "spent money on February *4* at a Baltimore grocery store and on February *8* at a Cockeysville restaurant." AB 28.

22

By contrast, although there were also out-of-state transactions during that two-month period, a reasonable juror could infer that they were all remote transactions. None of them took place in a specific city—instead they all merely list the business's state like "CA," "FL," and "VA"—and they all involve things that consumers tend to buy remotely like QuickBooks Online, a Verizon Wireless plan, and an Identity Guard plan. *See* JA2757. No reasonable juror was required to infer that Mosby, for example, travelled to "FL" to incur her "recurring" Verizon Wireless bill or to "CA" for her "recurring" QuickBooks Online bill when both charges hit her account on the same day. *See* JA2757. To be clear, none of Mosby's out-of-state purchases from December 15, 2020, to February 15, 2021, have a specific city or location for the transaction. Instead, they all just list the state in which the transaction was processed, and they all appear to involve things that people tend not to buy in person. So there was no reason for the jury to infer from them that Mosby ever left Maryland.

What is more, the jury could reasonably infer that when Mosby incurred an out-of-state charge in person, it looked just like her in-person charges in Maryland, which recorded the city and state of the business where they occurred. Consider, for example, the purchases she made in Florida after flying there on February 16, 2021, to close on the property in Longboat Key on February 19. *See* JA1294. On February 16, after making two purchases in "Baltimore MD," she incurred a charge with Spirit

23

Airlines and then made a purchase and withdrew money from a 7-Eleven in "Orlando FL." JA2762-2763. For the next two weeks, her check-card statement is filled with the sorts of purchases she made in Baltimore—groceries (Publix), fast food (Chick-Fil-A), and drugstore items (CVS)—except that the jury could reasonably infer that she made them in Florida based on the specific location attached to each purchase: "Bradenton FL," "Sarasota FL," and then "Longboat Key FL" (three purchases over seven days). JA2763. There were no non-Florida purchases on her card during this time, except for some "recurring" remote payments. *See* JA2763. On March 3, she incurred a charge with Gotogate and then was back making purchases in "Baltimore MD" at some of the usual businesses that appear in her bank statements. JA2764.

A reasonable jury could infer from these transactions that Mosby spent all of early February 2021 in Maryland and that she left it only on February 16 to fly down to Florida for two weeks. Thus, the jury could also infer that *everything* Mosby did with respect to the gift letter—from receiving its template on February 9, to filling it out and signing it, to submitting it to the mortgage lender by February 10—she did in Maryland. *See United States v. Johnson*, 956 F.3d 510, 517-518 (8th Cir. 2020).

The Eighth Circuit's analysis in *Johnson* shows that the jury properly found venue here. In *Johnson*, the defendant argued that the government had failed to prove venue in Minnesota as to a wire-fraud count. *Id.* at 517. He had sent the offending

24

wire on February 14, 2013, and for venue to be proper, he needed to have "sent [the wire] from Minnesota." *Id.* The defendant's bank records showed that he had written a check in Minnesota on February 12, 2013. *Id.* at 518. And when the recipient of the defendant's February 14 wire wrote the defendant a check, instead of wiring him the money he had requested, the defendant picked up the check in South Dakota on February 18 and deposited it in his Minnesota bank account the next day. *Id.* at 517. The Eighth Circuit held that this evidence, as well as the evidence that the defendant "lived, worked, and spent most of his time in Minnesota, support an inference that [he] sent the February 14 [wire, an email,] from Minnesota." *Id.* at 518.

Here, the evidence of venue is even stronger. Mosby, like Johnson, lived, worked, and spent most of her time in the district where she was tried. Mosby's bank records, like Johnson's, establish that she was in the district two days before and a few days after she sent the relevant communication (the gift letter on February 10, 2021). Mosby used her check card at the Five Guys in Cockeysville on February 8, and at both KC Hair & Beauty and a Dunkin' Donuts in Baltimore on February 16. JA2757, JA2762. But unlike Johnson, there is no evidence that she left the district between those dates. Indeed, despite knowing that the district court found venue based on this circumstantial evidence, *see* JA302-303, Mosby has not identified *anything* in the record showing that she stepped foot outside of Maryland between

25

February 8 (the day before she got the gift letter template) and February 16 (several days after she transmitted the completed gift letter). *See* AB 27-30. That is further proof that the jury properly found venue here.

Mosby nonetheless contends that the government did not present "sufficient evidence to allow a reasonable jury to find that [she] more likely than not sent the [gift letter] from [Maryland]." *Johnson*, 956 F.3d at 518 (stating the preponderance-of-the-evidence standard for venue challenges). She argues first that the government did not present direct evidence that she was in Maryland when she sent the gift letter, such as "cell-tower records" or an "IP address" providing her location. AB 27. But the government did not have to do so because venue can be shown "by circumstantial evidence alone." *Martinez*, 901 F.2d at 376; *see also Johnson*, 956 F.3d at 517-518 (affirming venue based on anaslogous facts). She argues next that a jury cannot infer that an act took place in Maryland because a person can leave the district in "a matter of hours." AB 28. That, of course, is true of most districts, and there is no evidence that Mosby did so in early February 2021. Indeed, it would have been unreasonable for any juror to infer that a Baltimore elected official who lived, worked, and spent most of her time in Baltimore and who did not make any in-person purchases outside of Maryland for months had nonetheless decided to leave Maryland to transmit the gift letter that she had turned around in 24 hours.

26

Mosby tries to analogize her case to *Sterling*, *see* AB 28-29, but the cases are fundamentally different. In *Sterling*, the defendant unlawfully "provided [a reporter] with a paper copy of [a] letter" containing national defense information. 860 F.3d at 243. There was no evidence of "how or where" the defendant physically transmitted the letter to the reporter. *Id.* The government nonetheless maintained that venue was proper in the Eastern District of Virginia because the defendant had "kept" the letter at his home within the district, allowing the jury to infer that his transmission of the letter to the reporter "likely began" there. *Id.* at 244. This Court disagreed, explaining that the jury "could only speculate" that when the defendant "[re]moved the letter from" his home, he did so "to transmit [it]" to the reporter. *Id.* No "evidentiary hook" allowed the jury to infer that was the defendant's reason. *Id.* So the problem in *Sterling* was that the evidence showed the defendant committing only a single act in the district—removing the letter from his home—and that act could support venue only if the defendant did it as "part of his plan to transmit" the letter to the reporter. *Id.* Here, by contrast, the jury could infer that Mosby was in Maryland for all of February 9 and 10, 2021. So it could also infer that *everything* Mosby did in making the false statement in the gift letter she did in Maryland.

In sum, Mosby has waived her venue challenge. On the merits, her challenge fails because the jury's venue finding is amply supported by the evidence at trial.

27

## II.    The district court correctly instructed the jury in the mortgage-fraud trial on venue.

**Issues:**

The district court instructed the jury that venue for Mosby's prosecution under 18 U.S.C. § 1014 was proper in the District of Maryland "if any act in furtherance of the crime occurred within the District." JA2439. The issues on appeal are whether Mosby preserved her claim of error regarding this instruction and, if she did, whether the instruction amounts to reversible error. *See* AB23-26.

**Standard of Review:**

When the issue is preserved, this Court reviews de novo the claim that a jury instruction does not "correctly state the applicable law." *United States v. Raza*, 876 F.3d 604, 613 (4th Cir. 2017). If the instruction is improper, the Court then reviews for harmless error. *Id.* at 614. But when the issue is not preserved, the Court reviews for plain error only. *United States v. Hager*, 721 F.3d 167, 185 (4th Cir. 2013).

**Analysis:**

As an initial matter, Mosby forfeited her objections to the district court's final venue instruction by failing to object to it at all on the day the court delivered it to the jury. *See* JA2294-2468. She did not object to it when the parties discussed the final jury instructions and other matters before closing arguments. *See* JA2297-2306. Nor did she object to it during the parties' discussions with the court in the two hours

28

between closing arguments and the final jury instructions. *See* JA2408-2429. Most importantly, she did not object to it, either, in her objections to the court after it had delivered the instruction and before the jury began to deliberate. JA2463-2468. So she has forfeited any objection to the instruction. *See* Fed. R. Crim. P. 30(d).

Under Rule 30(d), a party wishing to preserve an objection to a jury instruction "must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." *United States v. McCabe*, 103 F.4th 259, 278 (4th Cir. 2024) (quoting Fed. R. Crim. P. 30(d)). Even when the party has challenged at the "charge conference" the instructions the court later delivers, "the proper time for cementing objections to instructions is after they are given but 'before the jury retires to deliberate.'" *United States v. McConnell*, 792 F.3d 478, 504 n.15 (4th Cir. 2015) (quoting Fed. R. Crim. P. 30(d)), *vacated on other grounds*, 579 U.S. 550 (2016); *see also United States v. Duncan*, 598 F.2d 839, 855 (4th Cir. 1979) ("The function of the requirement that objection to jury instructions be made immediately following the charge is to allow the trial judge to rectify any errors he may have made."); *United States v. Idowu*, 443 F. App'x 885, 887 (4th Cir. 2011) (per curiam) (unpublished) (explaining that under Rule 30(d) "an objection is required after the jury is charged and before the jury retires" and that a "pre-charge colloquy or written objections will not suffice"); *cf. United States v. Hurwitz*, 459 F.3d 463, 480 n.9 (4th

29

Cir. 2006) (stating that it is "enough to preserve the issue" that the defendant "timely objected to [the] instruction, and he renewed the objection after the instructions were actually given"). Because Mosby failed to "object contemporaneously to the jury instructions" the court gave, this Court should review the issue for plain error. *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018); *see also* JA2463-2468.

The district court, in any event, did not err in instructing the jury about venue. The court took its venue instruction from the one that Mosby and the government jointly proposed before trial. There, the parties asked the court to "instruct the jury" that venue is proper in the District of Maryland "if any act in furtherance of the crime occurred within this district." JA2838, JA2856. The parties copied that instruction verbatim from the model venue instruction recommended in Judge Sand's leading treatise. *See* LEONARD B. SAND ET AL., 1-3 MODERN FEDERAL JURY INSTRUCTIONS— CRIMINAL, ¶ 3-11 (2024); JA2856 (citing Sand's treatise); *see also Ocasio v. United States*, 578 U.S. 282, 286 (2016) (citing it as a source of "standard instructions that are typically used"); *United States v. Sabhnani*, 599 F.3d 215, 238 (2d Cir. 2010) (calling it "the leading treatise on the subject" of model jury instructions).[9] What is

---

[9] Mosby changed her tune about this model venue instruction at the charge conference when she proposed a novel instruction of her own creation. *See* JA2255-2257. The day before the court delivered its final instructions to the jury, Mosby filed a written objection to the model venue instruction. *See* JA238-239. As noted, Mosby did not preserve her objection by raising it only at the "pre-charge colloquy" and in

30

more, some courts of appeals have expressly adopted this model instruction as their venue instruction. *E.g.*, Third Circuit Model Criminal Jury Instructions § 3.09 (2024) (instructing that "the government must convince you that some act in furtherance of the crime charged took place here"); Ninth Circuit Manual of Model Criminal Jury Instructions § 6.32 (2024) (same). The model instruction correctly states the law.

Venue is proper "where any part of a crime can be proved to have been done." *Smith*, 599 U.S. at 244 (internal quotation marks omitted). "To obtain a conviction under [18 U.S.C.] § 1014, the Government must establish two propositions: it must demonstrate (1) that the defendant made a 'false statement or report,' . . . and (2) that he did so 'for the purpose of influencing in any way the action of [a described financial institution] upon any application . . . or loan.'" *Williams v. United States*, 458 U.S. 279, 284 (1982) (brackets in original) (quoting 18 U.S.C. § 1014). This Court has not yet construed venue for § 1014. But where, as here, the statute punishes anyone who "makes or presents" a false statement to a recipient, venue is proper in any district where the false statement was "made or prepared," "submitted to" the recipient or an intermediary, or "ultimately came to rest" with the recipient. *Blecker*,

---

"written objections" before "the jury [was] charged." *Idowu*, 443 F. App'x at 887 (construing Rule 30(d)); *see also McConnell*, 792 F.3d at 504 n.15 (same).

657 F.2d at 632-33 (venue for false-claim offense under 18 U.S.C. § 287); *see also United States v. Barsanti*, 943 F.2d 428, 434-35 (4th Cir. 1991).[10]

The district court correctly instructed the jury that venue is proper "if any act in furtherance of the crime occurred within the District of Maryland." JA2439. That language has long been held to accurately convey where the crime was committed. *See, e.g.*, *United States v. Cashin*, 281 F.2d 669, 673 (2d Cir. 1960) ("By ordinary use of the English language the crimes alleged in the indictment," namely, schemes to defraud by false statements, "were 'begun' and 'continued' in Alabama, where almost all of the acts performed in furtherance of the scheme took place." (quoting 18 U.S.C. § 3237(a))); *United States v. Kibler*, 667 F.2d 452, 455 (4th Cir. 1982) ("An aider and abettor may be prosecuted in the district in which the principal acted in furtherance of the substantive crime."). So the court properly instructed the jury on venue. *Ebersole*, 411 F.3d at 530-33 (affirming as correct the instruction that venue is proper if "any act in furtherance of the crime" occurred in the district).

Mosby nonetheless says that the instruction is error because it allowed the jury to convict "based only on proof that preparatory acts like drafting or signing the gift

---

[10]    Mosby concedes that venue is proper in § 1014 cases in multiple districts—"where false statements were [1] communicated or [2] received." AB 24. Every court of appeals to consider the question appears to have held that § 1014 is a continuing offense that can be tried in multiple districts. *See United States v. Angotti*, 105 F.3d 539, 542-43 (9th Cir. 1997) (citing cases).

letter occurred in Maryland." AB24. But those acts are essential parts of the offense, not preparatory to it.[11] *See, e.g.*, *Blecker*, 657 F.2d at 632 (observing that venue was "unquestionably appropriate in the District of Maryland in which the false claims were prepared"); *United States v. Sparks*, 67 F.3d 1145, 1151 (4th Cir. 1995) (stating that "when Sparks supplied the new numbers . . . on that part of the loan applications . . . , she was making a false statement"); *United States v. Knott*, 928 F.2d 97, 99 (4th Cir. 1991) (stating that "appellant was properly convicted of making false statements in the loan application" when he "ratified [them] by his signature"). And if they were preparatory to the offense, then they would not be acts "in furtherance of" it. Take, for example, the standard jury instruction in conspiracy cases that the government must prove "an overt act committed in furtherance of the conspiracy." *United States v. Vinson*, 852 F.3d 333, 352 (4th Cir. 2017). Every person to hear that instruction

---

[11] Mosby relies on this Court's 1938 decision in *Reass* for the proposition that preparing and making a false statement "in a written composition" are "preparatory acts" and that a § 1014 offense begins only when the writing is "transmitt[ed] . . . to the lender." AB24. True, *Reass* held that an offense under former 12 U.S.C. § 1441(a) "took place" only when "the [false statement] was presented to the bank" and that everything else is "preparatory to the commission of the crime." 99 F.2d at 755. But the Supreme Court abrogated *Reass* when it held in 1982 that the government "must establish two propositions" to "obtain a conviction under § 1014," neither of which is presenting or transmitting the false statement to the bank. *Williams*, 458 U.S. at 284; *see also United States v. Smith*, 29 F.3d 914, 916-17 (4th Cir. 1994) (recognizing that *Williams* abrogated prior caselaw holding that § 1014 requires the defendant to communicate the false statement to the bank); *United States v. Johnson*, 732 F. App'x 638, 647-48 (10th Cir. 2018) (unpublished) (no communication requirement).

knows that any overt act "in furtherance of" the conspiracy necessarily occurs after the conspiracy has been formed. *See, e.g, United States v. Edwards*, 188 F.3d 230, 235 (4th Cir. 1999) (acknowledging there would be "insufficient evidence that the mails were used to send the tickets in furtherance of the fraudulent scheme," if the mailings occurred "before" the scheme "began"); *United States v. Curry*, 977 F.2d 1042, 1057 (7th Cir. 1992) (acknowledging that it "is true that [acts] could not be in furtherance of a conspiracy not in existence"). The government is unaware of any defendant who has argued, let alone successfully, that the standard jury instruction for conspiracy does not correctly state the law because it allows the jury to convict based on mere preparatory acts (like driving to the meeting where the conspiracy is formed), instead of acts taking place after the conspiracy has begun.

Even though Mosby's challenge hinges on this assertion, she does not develop an argument that the model venue instruction covers preparatory acts.[12]  Instead, she cites this Court's dictum in *Sterling* that the instruction is "ambiguous about whether the jury could find venue based on . . . preparatory acts." AB25. That was dictum because the Court's holding that the model instruction "coupled" with another one "appropriately conveyed" the law of venue obviated the need to rule on the model

---

[12]  Although the same venue instruction Mosby is challenging here was used in her perjury trial, *see* JA882-883, she does not argue that it was error there.

instruction alone. *See Sterling*, 860 F.3d at 245; *see also United States v. Horsley*, 105 F.4th 193, 212 (4th Cir. 2024) (defining "dicta"). So it does not control here. And because Mosby does not explain why the dictum should be followed, she waives the argument for lack of development. *United States v. Robertson*, 68 F.4th 855, 860 n.1 (4th Cir. 2023).

In any event, any error in the jury's venue instruction was harmless because, as explained, the evidence shows that *everything* Mosby did on the gift letter she did on February 9 and 10, 2021, when all the evidence shows that she was in Maryland. *See United States v. White*, 810 F.3d 212, 221 (4th Cir. 2016). Mosby did not propose a counter-narrative to either the jury or the district court. She did not submit any evidence showing that she did anything to the letter outside of February 9 and 10, nor that she was anywhere but in Maryland on those dates. So the evidence the jury credited in finding venue below would have compelled them to find venue again, no matter which gift-letter act of hers they were instructed to focus on.

Mosby nonetheless argues that venue would not be proper in Maryland if the gift letter "was *submitted* to the Florida-based lender by her Florida-based mortgage broker."[13] But Mosby completed the offense once she made the false statement "to

---

[13] The mortgage lender, United Wholesale Mortgage, was based in Michigan, *see* Gov. Ex. 2 at 843, not Florida.

35

anyone for the purpose of influencing the action of [the lender]." *United States v. Smith*, 29 F.3d 914, 917 (4th Cir. 1994). So she did not have to make it to the lender at all. *Id.* at 916-17. Even if § 1014 required actual communication of the statement to the lender, venue is proper where the defendant "submitted" the statement to an "intermediary." *Blecker*, 657 F.2d at 633. And the record supports only one finding: If Mosby transmitted the gift letter to her broker, she did it in Maryland.

In sum, the court's venue instruction correctly stated the law. In the alternative, any error was harmless based on the evidence of venue the jury credited.

### III.   The district court properly found that Mosby opened the door to questions about her perjury convictions.

**Issues:**

After Mosby testified in her defense case, the district court found that she had opened the door to some questions about the factual basis of her perjury convictions. JA2097. The parties agreed on the questions the government could ask Mosby about her perjury convictions, JA2105-2106, and the government asked them, *see* JA2161-2162. The issues on appeal are whether Mosby waived or forfeited her objections to these matters and, if she did not, whether the court abused its discretion in allowing the government to ask Mosby the agreed-on questions. *See* AB31-38.

**Standard of Review:**

When the issue is preserved, the Court reviews for abuse of discretion whether a defendant "opened the door to the introduction" of "challenged evidence." *United States v. McLaurin*, 764 F.3d 372, 384 (4th Cir. 2014). But if Mosby did not "timely object" to the district court's ruling that she opened the door, this Court reviews for plain error. *United States v. Garcia-Lagunas*, 835 F.3d 479, 492 (4th Cir. 2016). And if Mosby "concede[d]" below that she opened the door, she "waived" the argument that she did not. *Fields v. Fed. Bureau of Prisons*, 109 F.4th 264, 270 n.1 (4th Cir. 2024). A waived issue is "not reviewable on appeal." *Council*, 77 F.4th at 256.

37

**<u>Background:</u>**

At the end of her direct testimony in her defense case, Mosby stated that she had a perjury conviction and had "every intention to appeal it." JA2089. Her attorney then asked "why [she was] testifying today," and she responded, "Because I regret not testifying before, and I want this jury to hear my truth." JA2089. Her testimony concluded on that note, and the trial broke for lunch. JA2089. But before the parties were excused, the government flagged that Mosby "opened the door" to additional questions about her perjury convictions through her final answer. JA2090.

When the court reconvened after lunch, it asked the parties to discuss "the parameters of cross-examination." JA2091-2092. The government said that Mosby properly testified to "the fact of her conviction and the fact of her appeal," but noted that she then commented on "the underlying nature of the trial itself," which was "in the ears of the Court as they left." JA2093. Mosby implied, the government argued, that "the perjury conviction that's being put in to undermine her credibility should be undermined because she didn't testify in that trial" and thus "the prior jury didn't hear her truth." JA2094. The court agreed, ruling that "the door has been opened" to some "cross-examination" about the factual basis of her convictions. JA2096-2097. The government then described the specific pieces of "evidence presented in that earlier trial" that we wanted to "cross-examine" Mosby about. JA2097.

38

Mosby did not object to the ruling that she had opened the door to some cross-examination. Instead, she argued that if the government questioned her about all the evidence we had described, she would have to "present evidence" herself and "call witnesses," which would "prejudice" her. JA2099. She argued that the parties should not have "a do-over of the last trial" just because she had said "five words" about it. JA2099. The court reiterated—without objection—that "the door has been opened" to "allow [the government] to respond in cross-examination" to what she had said. JA2100. The court emphasized that it had "listened carefully" to Mosby's testimony, "looked at it over the break," and found that "the door is open" to some reasonable "cross in this area." JA2100.

After her counsel conferred, Mosby conceded that her testimony had made a "limited intrusion" into her perjury case. JA2101. She turned to how the government should be able to "respond" to her intrusion, proposing something "more limited" than allowing the government to "go through the whole [perjury trial] with [her] on cross-examination." JA2101. She proposed that the court "strike that part of [her] testimony," instruct the jury they "should not consider that testimony or something stronger," and "provide some limitation to where the Government goes on cross-examination." JA2102. The court invited the parties to discuss "what [Mosby was]

39

proposing." JA2103. Mosby agreed with that course of action, JA2103, and the court recessed for almost two hours, JA2105.

When the court reconvened, the government apprised the court that the parties had "arrived at an agreed-upon way to move forward on the cross-examination" of Mosby. JA2105. The parties had agreed that the government would ask her "about a dozen" questions about her perjury convictions. JA2105. Mosby thanked the court for giving the parties the "time to sort this out." JA2107. She then objected for the first time to the court's ruling hours earlier that she had opened the door to this cross-examination, stating that she wanted to "renew" her objection that she "opened the door." JA2107. The court either did not hear or did not acknowledge this untimely objection. Instead, the court thanked Mosby for "making, I think, very good progress so we can move things forward." JA2107-2108.

The jury finally returned to the courtroom, and the government asked Mosby the agreed-on questions about her perjury convictions. *See* JA2111-2116 (the cross-examination); *see also* JA2161-2162 (confirming only the agreed-on questions were asked). Mosby did not object to any of the questions. *See* JA2111-2116.[14]

---

[14]  Although Mosby objected at one point, the parties conferred, and she did not proceed with the objection. JA2110-2111. The number of questions asked about her perjury convictions was inflated by her requests that the questions be repeated, *see* JA2113-2114, and her refusal to answer some questions directly, *see* JA2116.

40

**Analysis:**

Mosby waived her challenge to the district court's ruling that she opened the door to cross-examination about her perjury convictions when she (1) did not timely object to the ruling or the argument that she had opened the door, (2) conceded that her direct testimony had made a "limited intrusion" into her perjury case, opening the door for the government to "respond," (3) and proposed the response the court later adopted, which resulted in the parties agreeing on the questions the government could ask her about her perjury convictions.

To preserve a claim of error here, Mosby needed to do everything differently. She needed to timely object to the ruling, which she could have done when the court asked to "hear from [her]." JA2098. Instead, she objected only to *the degree* to which she had opened the door, arguing that the parties should not have "a do-over of the last trial" because she said "five words" about it. JA2099. That did not preserve any objection to the ruling that she *had* opened the door. *See United States v. Hale*, 857 F.3d 158, 170 (4th Cir. 2017). When the court reiterated that it thought "the door is open" to reasonable "cross in this area" and asked Mosby to "respond," JA2100, she had another chance to object. Instead, after conferring with counsel, she conceded that her testimony had made a "limited intrusion" into "the prior case" to which the government could "respond." JA2101. That concession waived any argument that

41

she did not open to door to a government response. *Fields*, 109 F.4th at 270 n.1. By

making that concession, both the parties and the court agreed that she had opened

the door. The question then was: By how much? And Mosby waived any challenge

to the scope of the government's response when she proposed "some limitation" on

our cross-examination, JA2101; the court asked the parties to discuss her "proposal,"

JA2103; and after conferring for nearly two hours, the parties "arrived at an agreed-

upon way to move forward on the cross-examination," including an agreement on

the "scope" of the questions the government could ask about her perjury convictions.

JA2105. Any error in the scope of those questions, none of which were objected to,

is "invited error." *United States v. Mathis*, 932 F.3d 242, 257-58 (4th Cir. 2019).

Mosby did not preserve a challenge to the district court's ruling that she had

opened the door by objecting for the first time *hours after* the ruling was made. *See*

JA2107. First, her objection needed to be "timely," *Garcia-Lagunas*, 835 F.3d at

492, and it was too late to object after she thanked the court for giving the parties the

"time to sort . . . out" the government's response to her opening of the door, JA2107.

Next, she phrased her objection in terms of "want[ing] to renew" something she had

said before, JA2107, which minimized the likelihood that it would draw the court's

attention to an asserted error in the parties' "agreed-upon" course of action, JA2105.

By effectively telling the court it had already heard and considered the objection she

was purportedly renewing, her objection was "too loosely formulated" to "apprise" the court that she was saying *something new*. *See United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983). Indeed, the court did not acknowledge, let alone rule on, her objection, further showing that she did not preserve this challenge. *See* JA2107-2108. Instead, the court thanked her "for making . . . very good progress so we can move things forward" with her cross-examination. JA2107-2108. What is more, by failing to ask the court to rule on her objection, she "waived" it yet again. *Basham*, 561 F.3d at 335. So this Court should not review this challenge for several reasons. *See Council*, 77 F.4th at 256. At the very least, it should deem the challenge forfeited and review it for plain error only. *Garcia-Lagunas*, 835 F.3d at 492.

On the merits, the district court did not abuse its discretion in concluding that Mosby opened the door to cross-examination about her perjury convictions. *Both* the parties *and* the court believed that Mosby's direct testimony opened the door to some cross-examination about the facts underlying her perjury convictions. As people who saw and heard her testimony live, they were "in the best position to determine the effect" of it on the jury. *McLaurin*, 764 F.3d at 384. Mosby conceded, for example, that her testimony implied that her "perjury conviction is an unreliable indicator of her credibility." ECF No. 457 at 3. The government, too, saw that Mosby's testimony "undermined" the jury's confidence in her perjury convictions by telling them that

43

she did not testify at that trial and her convictions were based on questionable facts that "her truth" would have dispelled. JA2094; *see also* JA227 (acknowledging that she implied she "would have been acquitted if she had testified at the perjury trial"). That opened the door to cross-examination on the factual basis of those convictions. As the court determined without objection, it needed to be "fair to the Government and allow them to respond" to Mosby's implications. JA2100. Because Mosby tried to "undermine confidence" in her perjury convictions by calling into question their factual underpinnings, she "opened the door to questioning" about their underlying facts because to "allow such an attack to go unanswered would have been unfair." *United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009).

Mosby nonetheless argues that it was not "remotely defensible" to believe that her testimony did anything "more" than express her "regret" for not testifying at her first trial. AB33. That assertion itself is not remotely defensible because of her earlier concessions that her testimony had made a "limited intrusion" into her perjury case, JA2101, by implying both that she "would have been acquitted if she had testified at the perjury trial," JA227, and that her "perjury conviction is an unreliable indicator of her credibility," ECF No. 457 at 3. Indeed, her perjury convictions are admissible in the first place because they are "peculiarly probative of [her] credibility." *United States v. Estrada*, 430 F.3d 606, 616 n.3 (2d Cir. 2005). She says next that she "made

44

clear" that she was not attacking the factual basis of her perjury convictions because she said that the earlier jury did not hear "'my truth,' as opposed to 'the truth.'" AB33. But the jury "cannot be expected to draw such fine distinctions" in listening to testimony, *McLaurin*, 764 F.3d at 384, especially when both the parties and the court immediately recognized that she had attacked the factual basis and opened the door to a response. Finally, she says that *United States v. Robinson*, 8 F.3d 398 (7th Cir. 1993), shows that she did not open the door. AB34. But this case is a far cry from *Robinson*. There, the Seventh Circuit held that the defendant did not open the door to the facts underlying his prior conviction when he "merely denied his guilt" of that crime. 8 F.3d at 410. But in reaching that holding, the Seventh Circuit noted that the defendant did not "claim that the jury who convicted him had been misled." *Id.* Here, Mosby made that claim when she said that she "regret[ted] not testifying before" and depriving the earlier jury of her "truth," JA2089, implying that the jury's verdict was "unreliable," ECF No. 457 at 3, and the jury "would have . . . acquitted [her] if she had testified," JA227. By claiming that the jury did not hear the complete truth and would have acquitted her if it did, she was saying that it was misled.

In any event, *Robinson* does not appear to be correct on its facts. The Seventh Circuit held that the defendant did not "attempt to explain away his crime" by saying that he "had not committed it." 8 F.3d at 410. But by saying he did not commit it, he

explained away his prior conviction. The Seventh Circuit thought that a defendant needed to either "describe the underlying facts . . . to explain *why* he was innocent" or "claim that the jury who convicted him was misled or confused" to open the door to the factual basis of his prior conviction. *Id.* But that does not appear to be correct. If a defendant were to testify that *no facts* supported the conviction, the government should be able to correct that misleading impression by showing that the conviction had *a basis in fact*. Although *Robinson* is relevant here only if it is persuasive, Mosby does not argue why it is persuasive, waiving any such argument.

Mosby also asserts that the government's response to her opening of the door was not "reasonably tailored." AB34. But, as explained, she waived this argument by agreeing below on the "scope" of the questions the government could ask her, *see* JA2105-2106, and that the government asked her only those questions, *see* JA2161-2162. Indeed, she did not object to any of them. *See* JA2111-2116.

In any event, any error here was harmless. *See Ebert*, 61 F.4th at 404-05. It is difficult for Mosby to argue that she was prejudiced by her answers to the questions that she agreed she could be asked. The jury did not convict her of six of the seven charged false statements, *see* JA290-291, showing that they were not substantially swayed by her answers. And the evidence against Mosby for her false statement in the gift letter was overwhelming. Although Mosby claimed in the gift letter that she

46

had received a $5,000 gift from Nick Mosby, JA2747, bank records showed that two days after Mosby signed the gift letter, she gave Nick Mosby the $5,000 that he later "gifted" her, JA1366-1370; Gov. Ex. 55. Indeed, Nick Mosby had less than $3,500 in his bank account on the day he signed the gift letter (February 9, 2021), JA2769, and less than $2,800 when Mosby gave him the money to "gift" her, JA1367. In her defense case, Nick Mosby agreed that this is what happened. JA1697-1698. Mosby agreed, too. She testified that she sent Nick Mosby the $5,000 he gifted her, "just in case he didn't have the $5,000" in additional assets. JA2082. So it was undisputed that Nick Mosby did not gift her $5,000. As the government observed in our closing, "Returning Ms. Mosby's money is not a gift." JA2319.

What is more, Mosby did not have any defense case against her false statement in the gift letter. In her closing, she was reduced to arguing that the gift letter did not contain a false statement because by stating "in all capital letters" that Nick Mosby gifted her $5,000 to be transferred "at closing," she was "making clear to everyone that [she] might be supplying part or all of the $5,000 to Mr. Mosby." JA2372. She asked the jury to make the "inference" that Bennett told her that she could gift herself the money, JA2373, even though Bennett testified that he told her that the gift money had to come from a "disinterested party" and "not [her,] the buyer." JA1849-1850. In the alternative, she argued that the jury should infer that it was never her plan to

47

"gift herself the money" to make it look like she received additional assets. JA2373.

The jury should infer, she suggested, that she "wired [Nick Mosby] the money as a

backstop" in case he did not have the money at closing. JA2373. It just so happened

that he never gifted her $5,000 but only returned to her the $5,000 she had sent him.

In the end, Mosby had no coherent story about why the jury should find that her gift-

letter statement was anything but a false statement knowingly made to deceive the

mortgage lender into thinking that she had received additional assets. So any error

in cross-examining her about her perjury convictions was harmless.

Mosby nonetheless argues that any error was not harmless for several reasons.

Some of them conflict and are self-defeating—like her contentions that (1) the jury

was "far more likely" to convict her after hearing that her perjury convictions were

based on her "false statements on financial forms," AB36, and (2) the jury did not

convict her of "six of the seven allegedly false statements," AB35. She also argues

that because the court severed her trials and would not have allowed the government

to cross-examine her about the factual basis of her perjury convictions if she had not

opened the door to it, any evidence about the factual basis was "unduly prejudicial."

AB36-37. But the limited cross-examination on JA2111-2116 does not stand in the

same shoes as all the evidence that came out in her three-day perjury trial. And she

waived any Rule 403 argument she may have had by agreeing to the questions the

48

government could ask her in that cross-examination. *See* JA2105-2106. Finally, she maintains that the district court's jury instruction about the perjury convictions was "internally inconsistent" and that the government improperly used those convictions "during its closing argument." AB37-38. But she did not object to either the court's jury instruction or the government's use of her convictions in closing. *See* JA2298-2299, JA2331, JA2408-2410. And by raising these claims only in two paragraphs to say why any error was not harmless, she waives them for lack of development. *See Robertson*, 68 F.4th at 860 n.1.

In sum, Mosby either waived or forfeited this claim of error. In any event, any error was harmless.

49

### IV. The district court correctly denied Mosby's untimely pretrial motion to dismiss the perjury counts.

**Issues:**

After the district court set a pretrial motion deadline of June 1, 2022, ECF No. 61, Mosby filed on June 16, 2022, an untimely motion to dismiss the perjury counts for failing to "state a viable offense." JA66-80. The court denied the motion. JA165-167. The issues on appeal are whether Mosby waived or forfeited her challenge to the indictment by not even trying to show good cause for her motion's untimeliness and, if she did not, whether the court erred in denying it. *See* AB39-42.

**Standard of Review:**

If a defendant "makes a timely objection to the indictment," this Court reviews de novo whether it "properly charges an offense." *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009). The defendant must object to the indictment's "failure to state an offense" by pretrial motion "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v). When the district court has "set a deadline for the parties to make pretrial motions" and the defendant does not meet it, "the motion is untimely." *Id.* R. 12(c)(1), (c)(3). The court "may not consider" any "untimely" motion "unless the defendant shows 'good cause'" for its untimeliness. *United States v. Ojedokun*,

50

16 F.4th 1091, 1113 (4th Cir. 2021) (quoting Fed. R. Crim. P. 12(c)(3)). And if good cause is not shown, the untimely motion is "waived." *Id.*

**<u>Analysis:</u>**

To start, Mosby waived her pretrial challenge to the perjury counts by filing an "untimely" motion and failing to argue, let alone show, "good cause" for its untimeliness. Fed. R. Crim. P. 12(c)(3). By arguing that the counts did not "state an offense" because the certification she had made was "fundamentally ambiguous," she was raising, as she acknowledged, a motion under Rule 12(b)(3). JA66, JA74; *see also* Fed. R. Crim. P. 12(b)(3)(B)(v). She also knew that her motion was untimely because it missed by weeks the court's deadline for pretrial motions. *See* ECF No. 61. She had no good cause to be untimely because if the certification actually was "fundamentally ambiguous," such that no one of "ordinary intellect could agree" on what it meant, JA75, this should have been one of her first objections to the charge, not one of the last. Because it was available to her from the beginning and could be resolved before trial, her failure to show "good cause" meant that the court did not have authority to "consider" it. *Ojedokun*, 16 F.4th at 1113. That the court still did so does not change the fact that the motion was untimely and thus "waived." *Id.*; *see United States v. Soriano-Jarquin*, 492 F.3d 495, 502 (4th Cir. 2007) (holding that an untimely Rule 12(b)(3) motion "must fail" because it missed "the motions deadline,"

51

even though the district court decided the motion on the merits without, it appears, addressing the motion's untimeliness); *United States v. Moore*, 769 F.3d 264, 268 (4th Cir. 2014) (holding that deciding the merits of an untimely Rule 12(b)(3) motion "in no way vitiated its waiver" where the court did not "so much as indicate there might be good cause to excuse the waiver"); *see also United States v. Galindo-Serrano*, 925 F.3d 40, 47-48 (1st Cir. 2019) (when a court resolves an untimely Rule 12(b)(3) motion only on the merits, it "does not cure the defendant's waiver").

On the merits, Mosby's pretrial challenge fails. A question is "fundamentally ambiguous only when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding . . . unless it were defined.'" *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012) (quoting *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986)). Ambiguity "may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when . . . considered as a whole." *Lighte*, 782 F.2d at 375. Fundamental ambiguity "is the exception" to the "rule" that when "a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false." *Sarwari*, 669 F.3d at 407. "It is only in exceptional cases that a question is so ambiguous . . . that no answer can be false as a matter of law." *United States v.*

52

*Carriles*, 541 F.3d 344, 362 (5th Cir. 2008); *see also United States v. Boskic*, 545 F.3d 69, 88 (1st Cir. 2008) (indicating that a question is "fundamentally ambiguous" when it "preclud[es] a finding that [the defendant's] answer to it was false").

Mosby's pretrial challenge to the term "adverse financial consequences" fails because the certifications underlying her perjury counts did not ask whether she had experienced "adverse financial consequences" with no further specification. It asked whether she had experienced any "stemming from [COVID-19] as a result of" four enumerated and objectively defined events. JA44, JA53. So her challenge to the term on its own did not address, let alone challenge, the actual question underlying her perjury counts. *See* JA74-80. Those counts alleged that she had committed perjury because she "had not experienced any of the enumerated financial hardships she claimed to have experienced." JA46, JA55. As the government argued below, the "evidence at trial" would show that Mosby (1) "was not 'quarantined, furloughed, or laid off' from the Baltimore City State's Attorney's Office, which was her only source of employment in 2020"; (2) "did not have reduced work hours at the Baltimore City State's Attorney's Office"; (3) "was not 'unable to work due to lack of childcare'"; and (4) "did not own or operate a business that closed or experienced a reduction of hours." ECF No. 72 at 12-13. Those were the four enumerated events (at least one of which) she claimed to have "experienced" under penalty of perjury.

53

JA44, JA53. And she does not argue that the definition of those events is fundamentally ambiguous. And if, as alleged, she did not experience any of them, there was no ambiguity at all in the question of whether she experienced "adverse financial consequences . . . as a result of [them]." JA44, JA53. Because the allegations in the indictment, if proved, showed that Mosby's "statements were false and [she] knew they were false," there was no reason to hold that they "[could] not, as a matter of law, form the basis for [perjury charges]." *United States v. Stover*, 499 F. App'x 267, 274 (4th Cir. 2012) (unpublished).[15]

Although this is the reason why the district court denied her challenge, JA166 (explaining that the four enumerated events provide "the standards for determining what it means to suffer 'adverse financial consequences'"), Mosby devotes only two sentences to contesting it, asserting that the "enumerated" events she claimed to have experienced at least one of "did nothing to clarify the meaning of ['adverse financial consequences']." AB41. She does not support that conclusory assertion with caselaw

---

[15] Take another example. Imagine a question involving a highly contested, subjective, and ambiguous term like "obscenity" or "unfairness." Now embed that term in a question with objective specifications like, "Have you been subjected to an act of _____ as a result of your serving in the military?" No matter how ambiguous the term in the blank might be, the question itself is not ambiguous for anyone who has not served in the military. If you have not served in the military, then you have not been subjected to *anything* as a result of it. That is the situation Mosby is in with respect to her certifications. Moreover, as argued below, the term "adverse financial consequences" does not suffer from the fundamental ambiguity she claims.

or analysis, waiving it for lack of development. *See Robertson*, 68 F.4th at 860 n.1. If Mosby wants to overturn the district court on that ground that it erred, she cannot fail to "explain what was wrong with the reasoning that the district court relied on in reaching its decision." *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015). So she has waived this challenge again.

In any event, Mosby has not shown that "adverse financial consequences" is fundamentally ambiguous. She argues that it was "not defined" in the certifications she signed, the federal statute they were based on, or IRS guidance. AB40. But that is not the standard, nor does it suggest that the term lacks any "meaning about which men of ordinary intellect could agree." *Sarwari*, 669 F.3d at 407. When terms "are undefined, we give them their ordinary meaning." *United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012). And at trial, the district court accurately defined the term: Any "unfavorable or negative outcome related to money." JA901; *see also Adverse*, OXFORD ENGLISH DICTIONARY (defining it as "unfavourable"); *Financial*, OXFORD ENGLISH DICTIONARY ("Of or related to finance or money matters."); *Consequences*, OXFORD ENGLISH DICTIONARY ("A thing or circumstance which follows as an effect or result from something preceding.").[16] Mosby nonetheless says that this definition

---

[16] These are the first contemporary definitions for each word in the Oxford English Dictionary online. *See* https://www.oed.com/ (last visited Nov. 22, 2024).

"does not encompass the full range of meanings that a person of ordinary intellect might give the term" because she could define "finance" instead as "the obtaining of funds or capital." AB40. But an unfavorable outcome in "obtaining funds or capital" would still be "related to money." *See Funds*, OXFORD ENGLISH DICTIONARY ("The money at the disposal of a person"); *Capital*, OXFORD ENGLISH DICTIONARY ("Real or financial assets possessing a monetary value"). So she does not even articulate a competing understanding of the term she calls fundamentally ambiguous.

Even assuming it is highly subjective and "open to numerous interpretations" whether something qualifies as "adverse financial consequences," AB40, Mosby does not claim to have experienced anything that would have made her certifications true under the *most expansive* interpretation of that term. She argues that she "could have reasonably understood" the term to cover "a pandemic-related loss of potential capital investments or other business opportunities" for the "nascent travel business (Mahogany Elite)" that she was "prepared to begin operating . . . upon leaving public service." AB41. Even if lost potential opportunities qualified, she certified that she had "experienced" them as a result of the "closing or reduction of hours of a business I *own or operate*," *see* JA44, JA53 (emphasis added), not a business she was going to "*begin operating* [over two years later] upon leaving public service" in "January 2023," AB6, AB41 (emphasis added). Mosby's failure to offer an "interpretation of

56

the [certification] where . . . [her] answer[s] would have been truthful," *United States v. Doost*, 3 F.4th 432, 444 (D.C. Cir. 2021), further shows that the court correctly held that they could support the perjury charges.

In sum, Mosby waived her pretrial challenge to the perjury counts by filing an untimely Rule 12(b)(3) motion and failing to argue, let alone show, good cause. In any event, the district court correctly denied her motion.

57

**V.    The district court properly denied Mosby's motion *in limine* to exclude evidence of how she used the money she acquired by means of her perjury.**

**Issue:**

Mosby was charged with perjury because in requesting early distributions of retirement funds she falsely certified that she was eligible for them because she had experienced "adverse financial consequences" stemming from COVID-19. JA44, JA53. She moved *in limine* under Federal Rules of Evidence 401 and 403 to exclude evidence of how she later used those funds. JA108-114. The district court denied her motion before trial. JA2950-2951. The issue on appeal is whether the court abused its discretion. AB42-49.

**Standard of Review:**

This Court reviews "evidentiary rulings for abuse of discretion" and will not reverse "unless the decision was arbitrary and irrational." *Robertson*, 68 F.4th at 861. Under Rule 401, "relevance typically presents a low bar to admissibility" because the evidence "need only be 'worth consideration by the jury,' or have a 'plus value.'" *United States v. Hart*, 91 F.4th 732, 742 (4th Cir. 2024). The Court applies a "highly deferential standard of review" to any "decision to admit evidence over a Rule 403 objection." *United States v. Freitekh*, 114 F.4th 292, 315 (4th Cir. 2024). The Court "must look at the evidence in a light most favorable to its proponent, maximizing its

58

probative value and minimizing its prejudicial effect." *Benjamin v. Sparks*, 986 F.3d 332, 346 (4th Cir. 2021). The district court's Rule 401 and 403 determinations "will not be overturned except under the most extraordinary circumstances, where [its] discretion has been plainly abused." *United States v. Elsheikh*, 103 F.4th 1006, 1026 (4th Cir. 2024) (per curiam).

**<u>Analysis:</u>**

The district court properly found that evidence of how Mosby used the money she had acquired by perjury was admissible at her trial for perjury. JA2950-2951. As noted, she was charged with perjury because in requesting early distributions of retirement funds she falsely certified that she was eligible for them because she had experienced "adverse financial consequences" stemming from COVID-19. JA44, JA53. So whether she experienced adverse financial consequences was a "fact . . . of consequence in determining the action." Fed. R. Evid. 401(b). And how she spent the money she received by means of that perjury had a "tendency to make [that] fact more or less probable than it would be without the evidence." *Id.* R. 401(a). If Mosby had spent the money on basic necessities, there would be no dispute that the evidence was relevant to whether she experienced adverse financial consequences. Similarly, that she spent the money instead on downpayments on two Florida homes that put her even deeper into debt was also relevant.

59

It does not matter that once Mosby certified under penalty of perjury that she had experienced "adverse financial consequences," she could legally withdraw more money from her retirement account than she needed to "meet a need arising from COVID-19" or cover "the adverse financial consequences experienced." JA94. Take another example. Imagine striking up a conversation (back in 2020) with a person in the grocery store who tells you that he has suffered adverse financial consequences from COVID-19 because he operates a business that has reduced its hours because of the quarantine. You feel bad for him and give him $100. If you then saw him use most or all of the $100 to buy lottery tickets or caviar, it would justifiably make you wonder whether he told you the truth. It would certainly be "worth consideration" and have a "plus value" if you later had to decide whether he had lied. *Hart*, 91 F.4th at 742. Same here—except that purchasing two Florida homes also required Mosby to take on massive amounts of new debt, which was also relevant to whether she, a public servant, had experienced adverse financial consequences.[17] Because the court did not act "arbitrarily or irrationally" in finding this evidence relevant, it should be affirmed. *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008).

---

[17] This evidence was also relevant to show Mosby's motive for committing perjury because it helped explain why she made the certifications and took the early distributions from her retirement account. *See United States v. Cole*, 631 F.3d 146, 155-56 (4th Cir. 2011). Needless to say, how Mosby spent the money shows why she filled out the certifications to get the money in the first place.

Mosby nonetheless says that how she used the funds is "entirely irrelevant" to whether she had "suffered 'adverse financial consequences.'" AB43. But in making this argument, she flips the standard of review on its head. In reviewing whether the evidence was relevant, this Court must "maximiz[e] its probative value." *Benjamin*, 986 F.3d at 346 (stating that the Court is "required to do" so in reviewing whether evidence is "relevant"). Instead, Mosby minimizes it by arguing that if "[s]omeone" suffered a loss of "one" dollar "possibly weeks or months earlier,"[18] evidence of that person's later use of "withdrawn funds" would do "nothing to makes it less or more likely" that he had lost the dollar. AB44. But she cannot prevail by arguing the wrong standard. *See United States v. Crump*, 65 F.4th 287, 295 n.5 (6th Cir. 2023). Nor can she prevail by taking for the first time an extreme position on the facts against which relevance is measured. *See In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014). She did not argue below that either her defense case or the evidence at trial would show that she experienced "adverse financial consequences" only by losing "one" dollar "weeks or months" before buying the Florida homes, failing to preserve this specific objection. *Id.* She argued instead that her downpayments on those homes were not relevant to whether she experienced "adverse financial consequences," regardless of

---

[18] Mosby's unargued premise is unreasonable. No ordinary English speaker of ordinary intellect would say that someone who lost their pocket change months ago suffered adverse financial consequences.

their alleged size. *See* JA110-114, JA128-132, JA2911-2916, JA2938-2940. And as explained, the court properly denied the objection she made and preserved.

The district court also properly rejected Mosby's Rule 403 objection. This decision, like the evidentiary ruling on relevance, is "fundamentally" for trial judges to make because they "are much closer to the pulse of a trial than [appellate judges] can ever be and broad discretion is necessarily accorded them." *Id.* "Rule 403 favors the inclusion and admission of evidence," and the bar for excluding evidence under it "is quite high." *McCabe*, 103 F.4th at 277. Mosby nonetheless argues that the court plainly abused its discretion because admitting the evidence carried too great a "risk of unfair prejudice." AB45. She asserts that the jury may have been "incensed by the notion of someone purchasing vacation homes [in late 2020 and early 2021]." But "unfair prejudice" exists only when there is a "genuine risk that the emotions of the jury will be excited to irrational behavior" and that risk is "disproportionate to the probative value of the offered evidence." *Freitekh*, 114 F.4th at 316.

The evidence of how Mosby used the early distributions from her retirement account to place downpayments on two Florida homes was not unduly prejudicial. That evidence was introduced at both trials: Her perjury trial, and then her mortgage-fraud trial. Her mortgage-fraud trial dealt directly with both properties, and that jury heard everything that she calls unduly prejudicial in her perjury trial. *See* AB45-46.

62

The mortgage-fraud jury heard that she (1) committed perjury to access $90,000 to pay the downpayments for both Florida homes, JA2110-2116; (2) called both homes a "vacation home," JA1283; (3) paid more than $1 million for them, Gov. Ex. 1(b) at 3, Gov. Ex. 2(c) at 5; and (4) purchased them for private gain, i.e., to either "invest in" or "rent [out]," JA2073-2074. And when asked to decide whether she had made false statements on the mortgage applications for those expensive Florida vacation properties, the mortgage-fraud jury convicted her of *only one* of the seven charged statements. JA290-291. That verdict shows that there was nothing unduly prejudicial about the evidence. For if the evidence were so prejudicial as to irrationally "lure the factfinder into declaring guilt," AB45, that jury would have convicted her of more than just the gift-letter statement. So the court did not plainly abuse its discretion by admitting the same evidence *in limine* in Mosby's perjury trial.[19]

Mosby also contends that the evidence "risked jury confusion" by misleading "jurors into believing that their task was to determine" whether she had withdrawn more money than she could justify or used the money for an impermissible purpose.

---

[19] The result of this natural experiment also shows that any error here would have been harmless. Mosby is challenging the denial of her pretrial motion *in limine*. AB42. So the jury's failure to convict her of six of the seven false statements in her mortgage-fraud trial—despite having been exposed to the same evidence challenged in her opening brief, *see* AB45-47—shows that it was not so prejudicial as to sway a jury "substantially." *Cole*, 631 F.3d at 154-55.

AB47. But she makes this assertion without explaining why it is plausible, waiving it for lack of development. *Robertson*, 68 F.4th at 860 n.1. And she ignores that the court instructed the jury at length that she was guilty only if she falsely certified that she had "experienced adverse financial consequences stemming from [COVID-19] as a result of [any of four enumerated events]." JA892-897. The jury "is presumed to follow its instructions," *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012), obviating any concern that the jury convicted her for doing something else.

Finally, in arguing that the district court abused its discretion in denying her motion, Mosby refers repeatedly to the government's arguments in summation. *See* AB45-46 (citing JA810). But the court, of course, did not consider those arguments in denying her motion before trial. Nor did Mosby object to them at trial. *See* JA810, JA831-32. So she has "forfeited the objection." *United States v. Moore*, 11 F.3d 475, 481 (4th Cir. 1993). What is more, despite Mosby's rhetoric, those arguments appear to do little more than track the facts—that she withdrew $90,000 from her retirement account and used it to purchase two Florida vacation homes, which were worth more than $1 million and which she hoped to make money off of. In any event, she does not raise an independent challenge to those statements.[20]

---

[20] Similarly, Mosby criticizes a jury instruction in arguing why any error in denying her motion was not harmless. AB49. She waives this, too, by not developing it or bringing it as an independent challenge. What is more, she concedes there would

64

In sum, the district court did not abuse its broad discretion in ruling that the evidence of how she used the funds she had acquired by perjury was admissible at her perjury trial.

---

have been no harm if the jury had been told she could "use withdrawal funds for any purpose." AB49. The jury was effectively given that message when instructed that she could withdraw (and thus use) funds "without regard to her need for [them]" or "the extent of the adverse financial consequences that she experienced." JA902.

**VI.    The district court properly determined that 90 percent of Mosby's Longboat Key property should be forfeited because of her mortgage-fraud conviction.**

<u>Issue:</u>

When the government moved for the criminal forfeiture of Mosby's Longboat Key property based on her mortgage-fraud conviction, ECF No. 510, she opposed it on statutory and Eighth Amendment grounds, JA305-322. After a hearing where no new evidence was offered, ECF No. 544, the district court ordered under 18 U.S.C. § 982(a)(2)(A) that she forfeit 90% of her interest in the property, JA331. The issues on appeal are whether the court properly found the property forfeitable and correctly held that the forfeiture does not violate the Excessive Fines Clause. *See* AB49-59.

<u>Standard of Review:</u>

This Court reviews findings of fact for clear error and conclusions of law de novo. *United States v. Herder*, 594 F.3d 352, 363 (4th Cir. 2010). Thus, "findings of fact regarding the forfeitability of the property are reviewed for clear error." *Id.* The government must "establish, by a preponderance of the evidence, that the property" is "subject to forfeiture." *Id.* And "whether a forfeiture constitutes a constitutionally excessive fine" is reviewed de novo, with the "burden on [Mosby]" to "demonstrate excessiveness." *United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000). Finally, the forfeiture is excessive only if it is "grossly disproportional." *Id.* at 815.

66

USCA4 Appeal: 24-4304     Doc: 60     Filed: 11/22/2024     Pg: 79 of 91

**Background:**

The Longboat Key property was listed on January 8, 2021. Gov. Ex. 2 at 61. Mosby jumped on it: It entered contract three days later, *id.*, and she signed her initial mortgage application three days after that, *id.* at 615. The contract said that she had to close on the property by February 19, 2021, on pain of default. *Id.* at 790.

Although her earlier mortgage for the Kissimmee home had a 2.990% interest rate, Gov. Ex. 1 at 8, Mosby locked in an even better rate of 2.875% on her mortgage for the Longboat Key home—but it also expired on February 19. Gov. Ex. 2 at 104, 576. So she needed to close on the mortgage by then to secure the rate. JA1315. But in early February, she learned that she needed another $5,000 in assets to close. *See* JA1846. That put her mortgage rate at risk because if she "didn't close then that rate lock was set to expire." JA1315. So she executed a gift letter, JA1317, falsely stating that she had received a gift of $5,000 from her then-husband, JA2747.

Compared to the lender "asking for additional assets" from Mosby, executing a gift letter could "speed up the closing process," so long as the gift "comes from an eligible source." JA1315. Mosby executed and submitted the letter on February 10, *see* JA2747, which cleared her application to close that same day, Gov. Ex. 2 at 104-105; Gov. Ex. 53(c). She signed the mortgage on February 19. Gov. Ex. 2 at 857, the last day she was guaranteed to have under the sales contract, *id.* at 790.

67

**Analysis:**

The district court did not clearly err in finding that 90% of Mosby's Longboat Key home is subject to criminal forfeiture. *See* Gov. Ex. 2 at 625 (showing that the mortgage paid for 90% of its purchase price). The parties agree that the legal test for forfeitability under 18 U.S.C. § 982(a)(2) is whether Mosby's offense—i.e., her false statement in the gift letter—was a "but for" cause of her obtaining the mortgage. *See* AB50-51; *see also* ECF No. 510 at 3. And the district court properly found that the mortgage lender "would not fund that mortgage for the property unless and until Ms. Mosby provided the gift letter." JA2520-2521. As the lender's underwriter explained at trial, Mosby was "short [of] funds to close" and thus could not "proceed into clear to close status" until she acquired "additional assets," which she allegedly did by means of the false "gift letter" that made it appear as though she "had adequate funds to close." JA1314-1316. Indeed, the day she submitted the gift letter to the lender, the lender cleared her application to close. *See* JA1316; Gov. Ex. 2 at 104-105. Thus, the court did not clearly err in its finding.

Mosby nonetheless says that the February 10, 2021, gift letter was not a "but for" cause of her obtaining the mortgage because she could have "waited two days to receive her regularly scheduled paycheck" on February 12 and "shown that at that point she had the necessary funds." AB51. But there is no record basis for assuming

68

that the mortgage lender would have accepted a regular paycheck as the "additional assets" she needed.[21]  *See* JA1315. The lender already knew of her monthly income, *see* Gov. Ex. 2(a) at 2, and she provides no reason to believe that the lender had not already factored it in. Indeed, that she submitted a false gift letter, instead of waited for her paycheck, shows that there was a problem with her using existing income as an additional asset. After she told her broker that she would be getting the paycheck on February 12, *see* JA1846, JA2371, he still told her that she needed the gift letter, JA1847-1848. And there is more: Even if the lender would accept a regular paycheck as additional assets, her paycheck was slightly less than the $5,000 she needed. *See* JA2762; *see also* JA1846-1848. She does not explain why a smaller amount would have sufficed. And not counting the $5,000 she sent to her then-husband as the "gift" he was giving her, her bank account saw more than $36,000 in withdrawals between her less-than-$5,000 paychecks on February 12 and 26, *see* JA2762-2763, calling further into question whether she could have shown $5,000 in additional assets by means other than the false gift letter. Thus, the court still did not clearly err in finding that the letter was a but-for cause of her receiving the mortgage.

---

[21]  Mosby's regular income was subject to her regular expenses. She does not point to anything in the trial record indicating that the lender would have cleared her to close so long as she had a certain amount of money in her account for even a brief time. By specifying there would be "no repayment" of the gift, JA2747, the gift letter made clear that the additional assets needed to be untouched by any obligation.

69

Mosby also stakes out a more extreme position. She says that unless the court could find that "but for the [gift] letter, [she] *could not* have obtained" *any* mortgage "to buy the home," she does not need to forfeit the home. AB51. In other words, if she could have obtained "another" mortgage without the gift letter, the gift letter was not a "but for" cause of the mortgage she did obtain. AB51. Mosby thereby asks this Court to turn "but for" causation into "the only possible means" causation. In doing so, she provides no authority supporting her extreme take on the "but for" test. *See* AB51-52. In her view, when a defendant defrauds a bank of money under 18 U.S.C. § 1344, he does not need to forfeit the money under § 982(a)(2)(A) unless the court finds that he "*could not* have obtained the same funds" by "another" means. AB51. So if he could have obtained the money legally (even if under worse terms), there is no forfeiture. The government knows of no authority supporting that notion. Take another example: A college student earns $3,600 by delivering illegal drugs; because he could have earned the same amount from a legal job, is he saved from forfeiting the money he earned? Of course not. That money is "clearly" subject to forfeiture as "property he 'obtained . . . as the result of' the crime." *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (interpreting statute analogous to § 982(a)(2)(A)).

In the end, the record shows that Mosby needed $5,000 in additional assets to be clear to close on her mortgage, that she advised her mortgage broker that she had

a new paycheck on the way, and that her broker still told her that she needed the gift letter. Without the gift letter, she would not have been cleared to close. And it is pure speculation to suggest otherwise. Nothing in the record shows that she could have met the February 19 deadline—the deadline for both her mortgage-rate lock and her duty to close under the property's sales contract—without the gift letter.[22]

Next, the district court properly held that requiring Mosby to forfeit 90% of the Longboat Key property is consistent with the Excessive Fines Clause. Because Mosby acquired 90% of the property using the $428,400 mortgage she obtained by means of the false gift letter, *see* Gov. Ex. 2(c) at 5, the court has merely ordered her to forfeit the proceeds of her offense. "In a case involving a single offender" like Mosby, it is "very difficult, and perhaps impossible, for the defendant to show that the forfeiture of proceeds was grossly disproportional to the gravity of his offense." *United States v. Jalaram, Inc.*, 599 F.3d 347, 355 (4th Cir. 2010). That is because a defendant who acquires property by means of a crime (here, mortgage fraud) cannot justifiably claim that he should continue to profit from the crime. *See Kaley v. United*

---

[22] Mosby asserts that the lender's "financial incentive to have the transaction succeed" means that she still would have been offered a mortgage even if she missed the deadline to close. AB51. That is presumptuous. The record does not say whether the lender would have done so, let alone the terms under which it might have done so. Nor does the record say whether the seller would have waited for Mosby to secure a new mortgage. Mosby's own experience on the housing market demonstrated how frequently offers on homes "fell through." JA2061, JA2064.

71

*States*, 571 U.S. 320, 323 (2014) ("Forfeitures help to ensure that crime does not pay."). So "there is a strong governmental interest in obtaining full recovery of all forfeitable assets," *id.*, including all the property Mosby obtained by fraud.

As Mosby acknowledges, Congress authorizes a fine of up to $1 million for her offense. AB57; *see also* 18 U.S.C. § 1014. That shows her offense is "serious," warranting "serious punishment." *Jalaram, Inc.*, 599 F.3d at 356. More importantly, her Guidelines range for the fine was also up to $1 million. *See* USSG § 5E1.2(c)(4) (providing that when Congress authorizes "a maximum fine greater than $500,000," the Guidelines range goes "up to the maximum authorized by the statute"); *cf. United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014) ("[T]he Guidelines maximum is $150,000, indicating a substantial level of culpability"). Because her forfeiture is in her Guidelines range, it is "presumptively reasonable." *Freitekh*, 114 F.4th at 322. Indeed, she is forfeiting only her interest in the $428,400 (plus appreciation) that she invested in the property through the fraudulently obtained mortgage, which is less than "half of the statutorily authorized monetary penalty" and thus "nowhere near the type of forfeiture" that the Supreme Court has deemed excessive. *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021). And because she is forfeiting only the property she personally obtained as the result of her crime, there is no concern that the forfeiture might work an "injustice" by making her "disgorge more money than

72

[she had] received from [her fraud]." *Jalaram, Inc.*, 599 F.3d at 355; *see also United States v. Peters*, 732 F.3d 93, 102 (2d Cir. 2013) ("The 'proceeds' of a fraudulently obtained loan equal the amount of the loan."). Similarly, there is no reason to find that making her forfeit the "proceeds [of her offense] was grossly disproportional to the gravity of [the] offense." *Id.* Again, forfeiture's purpose is "to ensure that crime does not pay." *Kaley*, 571 U.S. at 323.

In addition to looking at the relationship of the "amount of the forfeiture" to the "authorized penalty" in deciding whether the forfeiture is excessive, courts also look at "whether the defendant fit into the class of persons for whom the statute was principally designed," "the harm caused by the charged crime," and "the relationship between the charged crime and other crimes." *United States v. Spirito*, 36 F.4th 191, 212 (4th Cir. 2022). All of those factors also weigh in favor of the constitutionality of the forfeiture. First, Mosby committed classic mortgage fraud—with less than ten days remaining until her mortgage-rate lock expired and she was required to close on the Longboat Key property on pain of default, she executed a fraudulent gift letter to dupe the mortgage lender into thinking that she had sufficient assets to close. She committed the crime so that she would get in time both a mortgage and the mortgage she wanted. That falls in the heartland of the mortgage-fraud statute. *See* 18 U.S.C. § 1014. Next, by committing this crime while serving in elected public office as the

73

chief prosecutor of Baltimore, Maryland, Mosby inflicted "significant harm [on] the public," as the district court properly found. JA2522. It tears at the fabric of the law whenever the officials charged with enforcing it wantonly break it for private gain.[23] Finally, Mosby did not commit mortgage fraud alone—she also committed perjury. And one of her perjury offenses netted her the money (which she is not forfeiting) that she used to pay the 10% downpayment on the Longboat Key home. JA2116. So there are multiple crimes and convictions undergirding her purchase of that home.[24] For these reasons, forfeiting the portion of it she obtained by mortgage fraud is fully consistent with the Eighth Amendment's Excessive Fines Clause.

Mosby nonetheless contends that the forfeiture is unconstitutional because the current value of the Longboat Key property is $912,000. AB53. But that is debatable. According to Zillow.com, the property's estimated value as of November 22, 2024, is $735,700 and could be as low as $655,000. But this Court need not speculate on what the property is worth because 18 U.S.C. § 982(b)(1) provides that "forfeiture

---

[23] Mosby claims that her abuse of the public trust gave rise to only "abstract, diffuse injury" and thus warrants letting her keep the proceeds of her crime. AB54. But whenever a crime "involves public corruption," it "harms society as a whole." *United States v. McNair*, 605 F.3d 1152, 1216 (11th Cir. 2010).

[24] Mosby challenges the district court's finding by cherry-picking two cases involving even more pronounced criminal behavior and stating that the "connected" crimes must be of that "type or scale" to qualify. AB57. Wrong. What matters here is the "close relationship" between the crimes. *Spirito*, 36 F.4th at 212.

74

of property under this section . . . shall be governed by the provisions of [21 U.S.C. § 853]." And under § 853(c), "[a]ll right, title, and interest" in the forfeited property "vests in the United States upon the commission of the act giving rise to forfeiture." Because the United States's right to her $428,400 mortgage-based investment in the property vested the day she closed on the mortgage, she has no right to any growth in that investment. Thus, she cannot use any appreciation in the investment to argue that because her crime paid off, the constitution lets her profit from the crime.

Mosby argues that *United States v. 3814 NW Thurman Street*, 164 F.3d 1191 (9th Cir. 1999), shows that the forfeiture is unconstitutional. There, in a case where the fraudster was "not criminally prosecuted" and thus "no fine could be imposed," the Ninth Circuit concluded that a forfeiture of $200,686.16 was "excessive" mainly because it was "more than 40 times the maximum fine [of $5,000] permitted under the Guidelines." *Id.* at 1198. Here, by contrast, Mosby's forfeiture—whether viewed as $428,400 or $773,200—falls well within the Guidelines' range of "presumptively reasonable" fines. *See Freitekh*, 114 F.4th at 322; USSG § 5E1.2(c)(4).

Mosby also says that her crime is "far less serious than most federal offenses" because its seriousness should be measured against "the $5,000 value of the [fake] gift letter." AB55. But courts instead measure seriousness based on the punishments authorized by Congress. *Jalaram*, 599 F.3d at 356 (stating that "unlike the offense

75

in *Bajakajian*, which carried a maximum fine of $5,000, Jalaram's offense renders it liable for a fine of up to $350,000," indicating "that Congress considers crimes like Jalaram's far more serious" and that "Jalaram must clear a significantly higher hurdle to show that the requested forfeiture is grossly disproportional to the gravity of its offense"). The seriousness of her crime was also reflected in the "hundreds of thousands of dollars in illicit [proceeds]" she obtained from it. *Id.* Mosby's alternate position makes no sense: By her lights, when someone obtains a mortgage by making a false statement that does not involve a dollar sign (say, by claiming that he will use the house as his residence instead of a rental), it is not a serious offense—regardless of how much money he fraudulently obtained or the punishments he could receive. Mosby, here as elsewhere, provides no caselaw supporting her novel position.

Mosby says as well that she reaped no "actual benefit" by using the February 10 gift letter to secure a mortgage by February 19, AB56, the last day she could close on the mortgage with the locked-in rate and without running a risk of defaulting on the sales contract. But, as noted, the mortgage *was* the benefit, and it is speculative to say that she could have secured the same or another mortgage if she had tried to raise the additional assets by other means.

Finally, Mosby contends that because her real-estate investment turned out so well, she should be able to hold onto her criminal proceeds because they are "one of

her few remaining sources of income" while serving her sentence of home detention. AB58-59. That no longer appears to be true. *See* ECF No. 586 at 1 (announcing that she has "recently secured" employment and seeking permission to "travel to varying locations throughout Maryland" from "6:00 a.m. to 9:00 p.m."). In any event, if she wanted to keep her investment property, she should not have committed fraud to get it. She took a massive risk in committing crimes in her effort to become a real-estate investor. And she was caught. One result of her decision is that she must now forfeit "any property constituting, or derived from, proceeds [she] obtained . . . as result of [her fraud]." 18 U.S.C. § 982(a)(2)(A). Nothing in the Magna Carta or the Excessive Fines Clause stands for the idea that "crime does not pay, except for [maintaining a criminal's livelihood]." *Cf. United States v. Monsanto*, 491 U.S. 600, 614 (1989).

In sum, this Court should affirm the forfeiture order.

77

**CONCLUSION**

The Court should affirm Mosby's judgment of conviction.

Respectfully submitted,


Erek L. Barron
United States Attorney

/s/ David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) because it contains <u>18,871</u> words, excluding the parts exempted under Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type-style requirements in Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface and plain, roman style using Times New Roman in 14 point.

Dated: November 22, 2024                    <u>/s/ David C. Bornstein</u>
                                            Assistant United States Attorney


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 22, 2024, I electronically filed this brief with the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system and thereby electronically served it on Appellant Marilyn Mosby through her counsel of record, who are registered ECF Filers.

Dated: November 22, 2024                    <u>/s/ David C. Bornstein</u>
                                            Assistant United States Attorney